722 A.2d 887

**Sharon DEGREN**

v.

**STATE of Maryland.**

**No. 54, Sept. Term, 1998.**

Court of Appeals of Maryland.

Jan. 14, 1999.

John L. Kopolow, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.; David J. Taube, Staff Atty., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., RODOWSKY, CHASANOW, RAKER, WILNER, CATHELL, and RAYMOND G. THIEME, Jr. (specially assigned), JJ.

CATHELL, Judge.

In this case we must determine whether a person with responsibility for a minor child who fails to prevent that child from being raped while the child is in her presence may be convicted of sexual abuse under the child abuse statute. In addition, we must ascertain whether the trial court erred in denying motions with respect to comments made by the State's Attorney during closing arguments that implied the defendant, by virtue of her status as a criminal defendant, had a motive to lie. We shall affirm.

## I. Procedural History

Sharon Degren,[1] petitioner, was charged in the Circuit Court for Charles County with four counts of child abuse, four counts of second degree rape, three counts of second degree sexual offense, one count of third degree sexual offense, and two counts of conspiracy for her involvement in the molestation of victim Jennifer B. Petitioner moved for and was granted a judgment of acquittal on three counts of second degree rape. Petitioner ultimately was found guilty by a jury of four counts of child abuse and not guilty of three counts of second degree sexual offense. The jury could not agree on a verdict as to one count of second degree rape, one count of third degree sexual offense, and one count of conspiracy.[2] Petitioner was sentenced to four concurrent ten-year sentences. Five years of each sentence were suspended in favor of five years of probation.

Petitioner appealed to the Court of Special Appeals. In an unpublished opinion, that court vacated one condition of petitioner's probation, but affirmed the trial court in all other respects. *Degren v. State,* 119 Md.App. 814 [No. 1135, 1997 Term, slip op., filed Feb. 25, 1998]. Petitioner filed a Petition

---

**1.** Throughout the record, petitioner's name is spelled several different ways. We shall adopt the spelling used in the parties' briefs and by the Court of Special Appeals.

**2.** Apparently the jury was asked to deliberate as to only one count of conspiracy.

for Writ of Certiorari in this Court on March 24, 1998. She presents the following questions for our review:

1. Did the lower courts err in holding that an adult with responsibility for supervision of a child may be guilty of sexual child abuse if she fails to prevent another person's sexual molestation or exploitation of the child?

2. Did the trial judge err by allowing the prosecutor to tell the jury in closing argument that the "number one reason" for not believing Petitioner's testimony is that "nobody in this country has more reason to lie than a defendant in a criminal trial"?

We granted the petition in order to resolve the important issues raised by this appeal.

## II. Facts

In the summer of 1996, Jennifer was twelve years old. She had known petitioner and her husband, Nick Degren, for about three years as the Degrens were friends of Jennifer's mother. At some point, Jennifer's mother arranged for Jennifer to stay with the Degrens for about a week in June and for two weeks in August of 1996. Jennifer did not object to this arrangement.

We shall set forth a summary of the evidence bearing on the four incidents of alleged child abuse verbatim as recited by petitioner in her brief, which is almost identical to the facts recited by the Court of Special Appeals in its opinion below:[3]

**Late June, 1996:**

Jennifer testified that one night she walked into Petitioner and Nick's bedroom and fell asleep on their bed. When she awoke, Nick was having sexual intercourse with her. Petitioner was sitting on the corner of the bed watching television and watching them. Nick asked Petitioner "if she felt right with him having sexual intercourse with me." Petitioner said "[s]he really didn't care." Nick ceased when Jennifer told him to get off of her. She left the room, then

---

**3.** *See Degren,* slip op. at 2–5.

returned and saw Petitioner and Nick having sexual intercourse. On cross-examination, when confronted with a statement she gave to Detective Goldsmith saying she agreed to having sex with Nick, Jennifer denied that she had told the detective that. When shown the same statement, Goldsmith confirmed that Jennifer did say she agreed to have sex with Nick on that occasion.

Petitioner, in her testimony, stated that nothing happened in her apartment in late June, 1996, because she did not move into that apartment until July.

**August 10, 1996:**

Jennifer testified that on August 10, 1996, on her second visit with the Degrens, she again fell asleep in their bed and again woke up to Nick having vaginal intercourse with her while Petitioner sat on a corner of the bed and watched them. After Nick and Jennifer had sex, Petitioner "ate me out[,]" by which Jennifer meant that Petitioner's mouth was touching her vagina. Jennifer acknowledged on cross-examination that her statement to Detective Goldsmith does not mention Petitioner ever putting her mouth on Jennifer's vagina. In fact, the first person she told about that act was the prosecutor, in January, 1997. She also denied telling the detective that Petitioner was aware of the rape but did not participate even though that remark is in her statement. Goldsmith confirmed that Jennifer never told him about an act of oral sex performed on her by Petitioner.

Petitioner testified that on August 10 she was lying in bed with Nick watching television when Jennifer came in and said she wanted to have sex with him and couldn't wait another day. She did not intervene because Nick, at times, was abusive and she "was afraid that he would hit [her]." Petitioner stated that the alleged act of oral sex never happened.

**August 14, 1996:**

According to Jennifer, on this occasion Richard Dobsha ("Rick") was at the apartment and remained there after Nick went to work. Jennifer went to sleep on Nick and

Petitioner's bed because their daughter was asleep in Jennifer's bed. When she woke up, Rick and Petitioner were engaged in sex on the bed. Jennifer went back to sleep only to be awakened by Rick having intercourse with her. While this was taking place, Petitioner "was talking sexual." After Rick finished having sex with Jennifer, Petitioner "ate me out again." However, she told Detective Goldsmith that she came into the room while Rick and Petitioner were engaged in sex; that she removed her clothing and lay down in bed next to them; that Rick moved over and had sex with her, ejaculating in her vagina, while Petitioner "had sex talk with him;" that Petitioner then experienced stomach pains and called her father to take her to the hospital. In her testimony Jennifer denied telling Goldsmith that she entered the bedroom, took off her clothes and got in bed with Rick and Petitioner.

Rick testified that on August 14 Jennifer told him she wanted to have sex with him. She sat on his lap, but he pushed her away. Jennifer rubbed his legs and his private parts and then removed her clothes. Rick tried to have sex with Petitioner but could not sustain an erection. She performed oral sex on Jennifer, after which the women reversed roles. While that was taking place, Rick tried to insert his penis in Jennifer's vagina but was not entirely successful. He admitted on cross-examination that in his statement he said nothing about Petitioner performing oral sex on Jennifer.

According to Petitioner, Jennifer initially wanted sex with Nick. After he left for work, she jumped onto Rick's lap and said, "take me, here I am, ... and I need to have sex." Rick pushed her away and said he wanted to have sex with Petitioner. However, Petitioner could not have sex due to a ruptured cyst. After lying in a hot tub for about an hour, she came into the bedroom and saw Jennifer and Rick having intercourse. Rick then tried to persuade Jennifer to have sex with Petitioner. At first unwilling, Jennifer eventually tried but Petitioner refused to participate. Petitioner denied having oral sex with Jennifer.

**August 15, 1996:**

Petitioner, Nick and Jennifer were again in the bedroom when, according to Jennifer, Petitioner inserted a vibrator in her vagina. Thereafter, Petitioner put the vibrator in Jennifer while Jennifer and Nick were engaged in intercourse. She acknowledged on cross-examination that she never told Detective Goldsmith that Petitioner used a vibrator on her and that her first mention of it was to the prosecutor during their third discussion of the case.

Petitioner testified that she returned from the hospital on the morning of August 15 feeling sleepy from medication she had been given. She lay down. Jennifer told Nick she was ready for sex. Petitioner left the room as they were having intercourse. She denied using a vibrator on Jennifer and denied even owning one.

Lori Owens, a friend of Petitioner, testified that in July or August of 1996 Jennifer, apparently unaware that Ms. Owens knew the Degrens, began telling her that she was staying with a "guy named Nick ... and his wife Sharon," that she had had sex with Nick quite a bit, and that he loved her and planned to leave his wife for her. When Ms. Owens revealed that she knew the Degrens, Jennifer "shut up." [Footnote omitted.] [Alterations in original.]

## III. Petitioner's Failure to Prevent the Rape of Jennifer

Under Maryland Code (1957, 1996 Repl.Vol.), Article 27, section 35C(b)(1),[4] "[a] parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a child ... who causes abuse to the child is guilty of a felony and on conviction is subject to imprisonment in the penitentiary for not more than 15 years."[5] Abuse includes both "[t]he sustaining of physical injury by a child as

---

4. All statutory references shall be to section 35C of Article 27 unless otherwise indicated.

5. Petitioner does not dispute that she was a person with responsibility for the supervision of Jennifer pursuant to section 35C(b)(1).

a result of cruel or inhumane treatment or as a result of a malicious act ... under circumstances that indicate that the child's health or welfare is harmed or threatened thereby," § 35C(a)(2)(i), and sexual abuse. Sexual abuse is defined in section 35C(a)(6)(i) as "any act that involves sexual molestation or exploitation of a child." The statute goes on to provide that " '[s]exual abuse' includes, but is not limited to: 1. Incest, rape, or sexual offense in any degree; 2. Sodomy; and 3. Unnatural or perverted sexual practices." § 35C(a)(6)(ii).

Petitioner argues she should not be held criminally liable for the sexual abuse of Jennifer because her omission or failure to prevent another person's act of sexual molestation or exploitation is not punishable under the language of the statute. In support of this argument, petitioner suggests that the plain meaning of the word "act" as used in section 35C(a)(6)(i) denotes a deed or something affirmative as opposed to an omission. Additionally, petitioner argues that under the doctrine of *ejusdem generis,* because her failure to prevent or stop the rape is not within the class of actions specifically prohibited by section 35C(a)(6)(ii), her inaction was not the type of conduct the Legislature sought to prevent. Finally, petitioner seeks to persuade this Court that the Legislature did not intend to criminalize one's failure to act in the context of sexual abuse. The State, on the other hand, argues that under the plain meaning of the language of the statute, the legislative intent, and the weight of the authority of decisions from this Court and other jurisdictions, petitioner's omission or failure to act constituted a criminal offense under section 35C.

We shall resolve petitioner's first question by interpreting the definition of sexual abuse in section 35C(a)(6)(i). Before making this interpretation, however, we shall discuss several important cases addressing criminal liability for one's failure to cease or prevent the physical or sexual abuse of a child.

Almost forty years ago, in *Palmer v. State,* 223 Md. 341, 353, 164 A.2d 467, 474 (1960), this Court affirmed a mother's conviction of involuntary manslaughter based on her failure to

protect her infant daughter from the repeated abuse of her paramour. In that case, shortly after they married and subsequent to the birth of their daughter, defendant Barbara Ann Palmer and her husband were separated. Ms. Palmer then met and began a romantic relationship with Edward McCue. Eventually, the two, along with Ms. Palmer's young daughter, Terry, moved in together. Various witnesses testified that soon after moving into their residence, it became apparent that McCue severely and repeatedly beat little Terry, causing black eyes and large bruises all over the child's body. One witness, a downstairs neighbor, testified that she confronted Ms. Palmer and McCue about the abuse, but McCue told her to mind her own business and that he would do what he liked to the child. Ms. Palmer later pleaded with the witness not to have McCue arrested and said the beatings were not as bad as they sounded. Terry continued to suffer great physical abuse at the hand of McCue in the days that followed. At approximately 6:00 P.M. on the day of Terry's death, McCue hit the infant with a blow or blows with his fist, hand, and belt that, along with other severe injuries, "literally ripped the infant's liver nearly in two and which tore the mesentery, a fatty, vascular tissue supporting the colon by connection to the abdominal wall." *Id.* at 348, 164 A.2d at 471. Terry died two to three hours later.

The State did not contend that Ms. Palmer ever inflicted severe punishment upon her daughter. The State's theory, rather, was that in her failure to protect or remove Terry from the abusive situation, Ms. Palmer should be held criminally liable for her death. The trial court agreed and concluded that Ms. Palmer was grossly and criminal negligent in her failure to protect her daughter. *Id.* at 351, 164 A.2d at 473. On appeal, Ms. Palmer argued she could not be criminally liable for the death of her daughter because her conduct did not amount to criminal negligence and was not the proximate cause of Terry's death.

We affirmed the judgment of the trial court. First, we noted that by statute, parents are charged with the "support,

*care*, nurture, *welfare* and education" of their children.[6] *Id.* at 343, 164 A.2d at 468. Ms. Palmer clearly breached this duty in permitting and, in fact, compelling this poor little defenseless urchin to remain in an environment where she was subjected to merciless, inhumane and inordinate brutality of a protracted nature, manifested a recklessness of justice and the rights and feelings of the tiny infant in such a manner so as to support the finding that the appellant's conduct and actions displayed "a wanton or reckless disregard for human life." The actions of McCue were so outrageous as to put any reasonable person on guard that the child's life was in real and imminent peril. Manifestly, the appellant should, and could, have removed little Terry from the cruelty and danger.

*Id.* at 351–52, 164 A.2d at 473. We then went on to consider whether there was sufficient evidence to sustain the finding that Ms. Palmer's negligence was the proximate cause of her daughter's death. Quoting at length from section 68 of 1 WHARTON, CRIMINAL LAW AND PROCEDURE (12th ed.1957), we stated:

"A person is only criminally liable for what he has caused, that is, there must be a causal relationship between his act and the harm sustained for which he is prosecuted. It is not essential to the existence of a causal relationship that the ultimate harm which has resulted was foreseen or intended by the actor. It is sufficient that the ultimate harm is one which a reasonable man would foresee as being reasonably related to the acts of the defendant. . . . To constitute the cause of the harm, it is not necessary that the defendant's act be the sole reason for the realization of the harm which has been sustained by the victim. The defendant does not cease to be responsible for his otherwise

---

6. *See* Md.Code (1957, 1983 Repl.Vol.), Art. 72A, § 1, *repealed by* 1984 Md. Laws, Chap. 296, § 1. See similar language in Maryland Code (1984, 1991 Rep. Vol., 1998 Cum.Supp.), section 5–203(b)(1) of the Family Law Article ("The parents of a minor child are jointly and severally responsible for the child's support, care, nurture, welfare, and education. . . .").

criminal conduct because there were other conditions which contributed to the same result."

*Palmer,* 223 Md. at 353, 164 A.2d at 474 (footnotes omitted). To be sure, we noted, the direct cause of Terry's death was McCue's physical abuse. His violent behavior, however, would have given any reasonable person notice that Terry's life was in danger. Ms. Palmer should have removed her daughter from this dangerous situation and because she failed to do so, we held, her inaction proximately caused Terry's death. *Id.*

Fifteen years later, in *State v. Fabritz,* 276 Md. 416, 348 A.2d 275 (1975), *cert. denied,* 425 U.S. 942, 96 S.Ct. 1680, 48 L.Ed.2d 185 (1976), we addressed a mother's failure to seek medical assistance for her three and one-half-year-old daughter after the child had been physically abused by the person in whose custody she had been left. In *Fabritz,* the defendant, Virginia Fabritz, had left her daughter, Windy, in the care of Thomas and Ann Crockett, with whom Ms. Fabritz resided, for about two days. Ms. Fabritz noticed upon her return that Windy was listless. Mr. Crockett told her that Windy was sick because he drove her on his motorcycle and the ride had been very bumpy. Later that afternoon, Windy complained of stomach cramps and had a fever. Ms. Fabritz thought Windy had the flu, but when she bathed her, she noticed that Windy's body had been badly beaten. Windy remained listless the entire afternoon, but Ms. Fabritz "did not take her to the hospital because she 'was too ashamed of the bruises on her daughter's body.'" *Id.* at 418, 348 A.2d at 277. Sometime that evening, Ms. Fabritz asked someone to look at Windy. When asked about the bruises all over Windy's body, Ms. Fabritz responded: "'Tommy [Crockett] hits hard.'" *Id.* at 419, 348 A.2d at 277 (alteration in original).[7] Mrs. Crockett eventually took Windy to the hospital, where she later was pronounced dead.

---

7. It was revealed at trial that Windy had "approximately seventy bruises or contusions covering her body, ranging in size from one inch to five inches." *Id.* at 418, 348 A.2d at 276.

Ms. Fabritz was charged with and convicted by a jury of child abuse. There was no evidence that Ms. Fabritz struck the blows that injured or killed Windy or that Ms. Fabritz knew Mr. Crockett would abuse her. There was evidence, however, that a child who suffered the injuries from which Windy ultimately died would have complained of such injuries and, furthermore, that Windy likely would have survived had she received medical attention up to an hour earlier. The issue on appeal to this Court was whether, to be found guilty under the child abuse statute, the accused must have caused the injuries, not just aggravated them by failing to seek medial assistance for the child.

In interpreting the language of the child abuse statute, we explored at great length the legislative history in enacting section 35C, which at that time was codified as section 35A. We said:

Codified under the subtitle "Child Abuse," the statute's declared legislative purpose is "the protection of children who have been the subject of abuse...." As heretofore indicated, the statute defines "abuse" to encompass "any physical injury or injuries sustained by a child as a result of cruel or inhumane treatment or as a result of malicious act or acts." Under the statute, any person having custody of a child under eighteen years of age who "causes" such abuse is guilty of a felony. The precursor to § 35A was chapter 743 of the Acts of 1963, which was originally codified as Code (1957) Article 27, § 11A and included under the subtitle "Assault on Children"; that statute, which was recodified as Article 27, § 35A by chapter 500 of the Acts of 1970, provided that any person having custody of a minor child under fourteen years of age "who maliciously beats, strikes or otherwise mistreats such minor child to such degree as to require medical treatment" would be guilty of a felony. It would appear from its terms that that enactment was not intended to reach acts of individuals not constituting, in one form or another, an assault on a child. It was not until § 35A was amended by chapter 835 of the Acts of 1973 that the Legislature repealed the "maliciously beats, strikes, or

otherwise mistreats" test of child abuse, and substituted in its place a new and different measure of the offense—one defined by new subsection (b) 7 in terms of physical injuries caused by "cruel or inhumane treatment or as a result of malicious act or acts." According to its title, one of the purposes underlying the 1973 amendment of § 35A was "generally extend[ing] the law of child abuse." Considering the particular use and association of words and definitions used in § 35A, we think a doubt or ambiguity exists as to the exact reach of the statute's provisions, justifying application of the principle that permits courts in such circumstances to ascertain and give effect to the real intention of the Legislature. *See Clerk v. Chesapeake Beach Park,* 251 Md. 657, 248 A.2d 479 (1968); *Domain v. Bosley,* 242 Md. 1, 217 A.2d 555 (1966).

*Id.* at 422–23, 348 A.2d at 279–80. We went on to conclude that the Legislature intended to broaden, through its amendments, the conduct punishable by the child abuse statute by repealing language that indicated the injury had to result from the hand of the accused and replacing it with more encompassing terms making an individual liable if the child's abuse resulted from "cruel or inhumane treatment" or by a "malicious act or acts." *See id.* at 424, 348 A.2d at 280.

■ In addition, we reasoned, the plain meaning of the statute supported this interpretation:

Affording the term "physical injury" the broad meaning that the context of § 35A would seem to mandate, we think a parent would be criminally responsible as having "caused" such a physical injury to his child in the sense contemplated by the statute if, as a result of the parent's "cruel or inhumane treatment," the child suffered bodily harm additional to that initially sustained as a consequence of the injury originally inflicted upon him.

*Id.* We ultimately held that Ms. Fabritz's failure to seek medical attention for her daughter was cruel and inhumane and, accordingly, she was properly convicted of child abuse. *Id.* at 425–26, 348 A.2d at 280–81.[8]

---

8. Ms. Fabritz's conviction was vacated on habeas corpus in *Fabritz v. Traurig,* 583 F.2d 697 (4th Cir.1978), *cert. denied,* 443 U.S. 915, 99 S.Ct.

Finally, in *Pope v. State*, 284 Md. 309, 396 A.2d 1054 (1979), we considered whether defendant Joyce Pope, a friend with whom Melissa Vera Norris and her three-month-old son, Demiko Lee Norris, were staying temporarily, could be convicted of child abuse as a person who had "responsibility for the supervision of a minor child" for her failure to intervene in or seek medical advice for Demiko when his mother physically abused him in Pope's presence. Ms. Norris and Demiko stayed with Ms. Pope one Friday night after church when Ms. Norris refused to go home to her grandparents' house, where she lived permanently. Ms. Norris claimed her grandparents' house was on fire, but it was not. In addition, both while at church earlier and after arriving at Ms. Pope's, Ms. Norris went in and out of various mental states of religious frenzy in which she thought she was God. Ms. Norris preached and ranted and then resumed to her normal self without noticing her transitions in personality. These episodes grew more severe. On Sunday morning while bathing the baby to go to church, Ms. Norris changed into "God" again and believed that Satan was hiding in her son. She began to exorcize the spirit verbally and then punched and poked Demiko repeatedly in his stomach, chest, and private areas. She beat his head and even lifted the baby up by putting her hands in his mouth, shaking him violently. Ms. Pope watched this episode but did nothing. Eventually, the two women and Ms. Pope's sister went to church with the baby. There someone realized the baby was badly hurt and sent for an ambulance. The baby was pronounced dead. Ms. Pope eventually gave a statement to police as to what had happened. She was charged with and

---

3106, 61 L.Ed.2d 879 (1979). Although the Court of Appeals for the Fourth Circuit held that the child abuse statute was unconstitutional as applied to Ms. Fabritz because of insufficient evidence, *id.* at 698, it otherwise accepted the statute and our interpretation in *Fabritz*, 276 Md. 416, 348 A.2d 275, as valid. Even so, "unlike decisions of the Supreme Court of the United States, decisions of federal circuit courts of appeals construing the federal constitution and acts of the Congress pursuant thereto, are not binding upon us." *Pope v. State*, 284 Md. 309, 320 n. 10, 396 A.2d 1054, 1062 n. 10 (1979). *See also Wiggins v. State*, 275 Md. 689, 698–716, 344 A.2d 80, 85–95 (1975); *Lone v. Montgomery County*, 85 Md.App. 477, 494, 584 A.2d 142, 150 (1991).

convicted of child abuse under section 35A, now section 35C, of Article 27.

We discussed in *Pope*, 284 Md. at 318–20, 396 A.2d at 1060–62, our decision in *Fabritz*, 276 Md. at 425–26, 348 A.2d at 280–81, that a parent's "act of omission" in failing to obtain medical assistance for her abused child constituted child abuse. We noted, however, that *Fabritz* did not address the class of persons to whom the child abuse statute applied. After reviewing the legislative history and the plain meaning of the statute, we determined a person with "responsibility for the supervision of a minor child" meant that

[a]bsent a court order or award by some appropriate proceeding pursuant to statutory authority, we think it to be self-evident that responsibility for supervision of a minor child may be obtained only upon the mutual consent, expressed or implied, by the one legally charged with the care of the child and by the one assuming the responsibility. In other words, a parent may not impose responsibility for the supervision of his or her minor child on a third person unless that person accepts the responsibility, and a third person may not assume such responsibility unless the parent grants it.

*Pope*, 284 Md. at 323–24, 396 A.2d at 1063. Therefore, *Fabritz* clearly applied not only to parents but to those individuals who had responsibility for the child and failed to act in the child's protection. Under the circumstances in *Pope*, however, the evidence did not support that Ms. Pope was a person with responsibility for Demiko and we set aside her conviction. *Id.* at 330, 396 A.2d at 1067.

The issue before this Court is related to the discussed cases in that petitioner, a person who had responsibility for Jennifer, failed to intervene while Jennifer was being sexually abused. The only real distinction in this case is that Jennifer was abused sexually rather than physically by two men on different occasions and on each occasion, petitioner either failed to come to Jennifer's aid or, as the evidence tended to show, actually watched Jennifer being raped. As we have said, we must determine whether section 35C penal-

izes an individual for his or her act of omission in failing to intervene when the child is sexually abused. This determination depends upon whether sexual abuse, as defined in the section 35C(a)(6)(i), includes a failure to prevent the molestation or exploitation of a child.

"The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995). As we often have said, the starting point for determining legislative intent is the language of the statute itself. *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater v. Mayor of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax,* 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks,* 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck,* 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss,* 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent. *Marriott Employees,* 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County,* 248 Md. 403, 414, 237 A.2d 35, 41 (1968).

In *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590, 594 (1992), however, this Court opined:

While the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which statutory language appears. Construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided. [Citations omitted.]

Thus, " '[w]e are not constrained ... by ... "the literal or usual meaning" of the terms at issue.' " *Edgewater Liquors, Inc. v. Liston,* 349 Md. 803, 808, 709 A.2d 1301, 1303 (1998) (quoting *Romm,* 340 Md. at 693, 668 A.2d at 2). Rather, we must "interpret the meaning and effect of the language in light of the objectives and purposes of the provision enacted." *Lewis v. State,* 348 Md. 648, 654, 705 A.2d 1128, 1131 (1998) (citing *Gargliano v. State,* 334 Md. 428, 435, 639 A.2d 675, 678 (1994); *Kaczorowski,* 309 Md. at 513–16, 525 A.2d at 632–33). Furthermore, we should construe the statute in a manner that results in an interpretation "reasonable and consonant with logic and common sense." *Lewis,* 348 Md. at 654, 705 A.2d at 1131. *See also Edgewater Liquors,* 349 Md. at 808, 709 A.2d at 1303.

To discern the intent of the Legislature in enacting and amending section 35C, we look first to the language of the statute and examine its plain meaning. Sexual abuse is defined, as we have said, as "any *act* that involves sexual molestation or exploitation of a child." § 35C(a)(6)(i) (emphasis added). The parties disagree on the meaning of the word "act." The term is not defined in the child abuse statute. Therefore, we turn to its common dictionary meaning. Act is defined in MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 11 (10th ed.1998) as "the doing of a thing: DEED"; "something done voluntarily"; "the process of doing: ACTION." As respondent points out, however, some commentators have suggested that "[i]n a legislative enactment, ... if the phrase act or omission is found, the first word is being employed in the limited sense of act of commission; whereas if only the word 'act' is used, it is construed ordinarily to include also forbearance or omission." ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW § 4, at 658 (3d ed.1982) (footnotes omitted). This interpretation generally is applicable and an act of omission culpable if the accused had some duty to act such as protecting a child from sexual abuse.[9] Finally,

---

**9.** Although we do not address in this opinion the existence of or scope of the duty of a person who has responsibility for the supervision of a

BLACK'S LAW DICTIONARY 25 (6th ed.1990), in its definition of "act" in the context of a "criminal act" states that "[a]n omission or failure to act may constitute an act for purpose of criminal law."

Additionally, the word "act" in the definition of sexual abuse is modified by the phrase "that *involves* sexual molestation or exploitation." § 35C(a)(6)(i)(emphasis added). The word "involves" connotes a broad sense of inclusion, such as an act *relating* to sexual molestation or exploitation. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 617 (defining "involve" as "to engage as a participant" or "to have an effect on" and "involved" as "being affected or implicated"). This modifying clause, therefore, appears to expand the scope of the word "act" from just the deed of molestation or exploitation into something done by the accused that relates to the molestation or exploitation. Because the word "act" in the definition of sexual abuse clearly is capable of more than one interpretation, we must turn to other means of discerning legislative intent.

This Court examined the amendments to the child abuse statute as related to physical abuse in *Fabritz,* 276 Md. at 422–23, 348 A.2d at 279–80. There we concluded that the General Assembly, through its various changes to the language of the statute, consistently expanded its scope and applicability to better achieve the goal of protecting "children who have been the subject of abuse." *See id.* at 423, 348 A.2d at 279 (quoting 1973 Md. Laws, Chap. 835 (title clause)). In 1973, for instance, the General Assembly broadened the conduct covered by the statute to include not only direct physical abuse but, as we have said, an act or failure to act that

child, we discussed this line of reasoning at some length in *Pope,* 284 Md. at 321–325, 396 A.2d at 1062–64, where we held that one with such responsibility can be prosecuted for his or her failure to intervene when the child is physically abused or failure to seek medical attention for the abused child. *Id.* at 328–29, 396 A.2d at 1066. We cite the Perkins & Boyce precept that duty imposes an obligation to act, and therefore liability for an omission to act, to point out that various common and plausible interpretations of the word "act" exist.

constituted cruel or inhumane treatment or a malicious act or acts. In 1974, the Legislature again amended the child abuse statute to include sexual abuse within the definition of child abuse: " 'Abuse' shall mean . . .:(B) any sexual abuse of a child, whether physical injuries are sustained or not." 1974 Md. Laws, Chap. 554, § (b)(7)(B). Sexual abuse was defined as

> any act or acts involving sexual molestation or exploitation, including but not limited to incest, rape, carnal knowledge, sodomy or unnatural or perverted sexual practices on [a] child by any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for supervision of a minor child.

*Id.* § (b)(8). The General Assembly declared "as its legislative intent and purpose the protection of children who have been the subject of abuse" and that the purpose of this 1974 amendment was to "expand[ ] the definition of child abuse [and] defin[e] sexual abuse." *Id.* (introductory paragraph and purpose clause).

Petitioner correctly notes that although the Legislature amended the definition of child abuse in 1974 to include sexual abuse, it did not utilize language as broad as that used in the 1973 amendment that expanded the type of conduct culpable as physical abuse to include an act or omission to act. Its failure to do so, petitioner argues, reflects the Legislature's intent to limit what constitutes sexual abuse to affirmative deeds.

We find petitioner's interpretation unconvincing. It defies common sense, logic, and the purpose and goals of the child abuse statute and its amendments. Under petitioner's theory, the Legislature intended to punish a parent or person responsible for the minor for failing to come to the minor's aid during physical abuse but not sexual abuse. By illustration, if petitioner had sat on the edge of the bed and watched Mr. Degren beat Jennifer, she could have been prosecuted under the statute for her failure to intervene. Because she sat on the bed and watched her husband rape Jennifer, even stating that

she "didn't care" whether Mr. Degren molested Jennifer, petitioner, under her interpretation of the statute, cannot be prosecuted for sexual abuse for failing to stop her husband because his actions were not physical abuse.[10] This position is absurd and we refuse to believe the Legislature intended such a result.

Implicit in petitioner's argument is the notion that the Legislature failed to enact more encompassing language, such as that used in the 1973 amendment of the definition of physical abuse, because it deemed sexual abuse a less serious offense than physical abuse. The language of the statute readily dispels that notion. In section 35C(a)(2)(ii), the Legislature declared in its definition of abuse that sexual abuse constituted abuse, "whether physical injuries are sustained or not." By clarifying that sexual abuse need not necessarily lead to physical injuries in order to be prosecuted, the legislature recognized the extensive emotional, psychological, or physical damage that sexual abuse can cause a child. Given this clear indication of the Legislature's awareness of the pervasive harm caused by sexual abuse, we find it difficult to believe that our law-making body, by this statute, would simultaneously punish an individual who watches and fails to intervene during the physical abuse of a child in her care but not punish that person when the child is raped or sexually molested under the same circumstances.

Other courts similarly have held parents or individuals responsible for a child criminally liable for his or her omission to act or failure to seek medical attention for the abused child in his or her care. *See State v. Miranda*, 245 Conn. 209, 217, 715 A.2d 680, 685 (1998) (concluding that the defendant, who was the mother's boyfriend and responsible for the welfare of her children, violated the assault statute for his failure to prevent or protect the child from abuse by the mother); *State*

---

**10.** Additionally, we note that the victim was not of sufficient age to give consent to the sexual acts performed upon her. The physical contact by petitioner's husband and by Rick Dobsha, in that regard, may have constituted physical abuse—a battery.

*v. Walden,* 306 N.C. 466, 476, 293 S.E.2d 780, 787 (1982) ("[T]he failure of a parent who is present to take all steps reasonably possible to protect the parent's child from an attack by another person constitutes an act of omission by the parent showing the parent's consent and contribution to the crime being committed."); *State v. Ainsworth,* 109 N.C.App. 136, 144, 426 S.E.2d 410, 415 (1993) (holding that the mother's failure to prevent the rape of her son while she was present and watching the act constituted child abuse); *State v. Williquette,* 129 Wis.2d 239, 250–51, 385 N.W.2d 145, 155 (Wis.1986) (concluding that the mother's failure to prevent the father's abuse of their children by leaving them in his care when she knew he regularly abused them physically and sexually constituted child abuse under the language of the statute).

The facts in *Ainsworth* were not unlike the circumstances in the case *sub judice.* In that case, the victim was a twelve-year-old boy who lived with his mother, defendant Deborah Ainsworth, and stepfather, defendant Duncan Ainsworth. Both the mother and the father were long-distance truck drivers who one day brought Brenda Morell, a woman about thirty years old, home from one of their trips. Mr. Ainsworth explained to his stepson that Brenda was his mother's girlfriend. Brenda was also a babysitter for the child and lived with the family, sharing Mr. and Mrs. Ainsworth's bedroom and bed.

The child testified at trial that late one evening Mr. Ainsworth called him down to his parents' bedroom. There the child saw all three adults naked in bed. Mr. Ainsworth told the child that " 'me and your mom agreed' 'that [he] could watch.' " *Id.* at 139, 426 S.E.2d at 412 (alteration in original). The Court of Appeals summarized in its opinion what then transpired:

> After a few minutes the child's stepfather "called" him over to the bed and pulled his shorts and underwear half way off. The child pulled them the rest of the way off, and then sat down on the corner of the bed where he watched his mother and Brenda having "intercourse." The child described the "intercourse" as his "mom stick[ing] her

finger up Brenda's vagina." At the same time that Deborah was engaged in "intercourse" with Brenda, Duncan was engaged in anal intercourse with Deborah. After watching this, Duncan made a "fingering" motion to the child. . . . His stepfather then mouthed something to the child who testified, "I could read and I read his lips kind of. . . . He said get on top of her, and then let her give you a blow job. . . . He just said it like in lips." The child then testified: "[a]fter my mom was done with Brenda, I got on top of Brenda and had intercourse." While the child was lying on top of Brenda and engaged in intercourse, Duncan was on his side facing Deborah, and Deborah was in the middle of the bed lying on her side facing Brenda. Neither Deborah, Duncan nor Brenda said anything while the child was engaged in intercourse with Brenda.

*Id.* at 139–40, 426 S.E.2d at 412–13. The child also had intercourse with Brenda on two other occasions. Once his mother and stepfather found out about this they became angered and kicked Brenda out of the house. Mrs. Ainsworth told her son, "I was upset because Brenda was having sex with you behind my back." *Id.* at 140, 426 S.E.2d at 413. Mr. Ainsworth told the child that he was "behind Deborah one hundred percent about why you was having sex behind our backs." *Id.* The child also testified that he had watched several pornographic movies with his parents.

Mrs. Ainsworth was charged and convicted with, among other things, first degree rape of her son on the theory that she failed to prevent sexual intercourse between her son and Brenda. The appellate court affirmed her conviction relying, in part, on *Walden,* 306 N.C. at 475–76, 293 S.E.2d at 786–87. In *Walden,* the mother of the victim was present when her small child was beaten repeatedly by his father but failed to intervene or stop the abuse. Although she did not strike the boy, the mother was found guilty of child abuse. The Supreme Court of North Carolina agreed, noting the affirmative duty of parents to protect their minor children and the trend in modern law to enlarge "the scope of criminal liability for failure to act in those situations in which the common law or

statutes impose a responsibility for the safety and well-being of others." *Id.* at 473, 293 S.E.2d at 785. The court held: "[T]he failure of a parent who is present to take all steps reasonably possible to protect the parent's child from an attack by another person constitutes an act of omission by the parent showing the parent's consent and contribution to the crime being committed." *Id.* at 476, 293 S.E.2d at 787.

Mrs. Ainsworth, the Court of Appeals stated, likewise failed to take any steps to prevent the rape of her son:

> Indeed, the State's evidence shows that the defendant lay on the same bed as the one in which her twelve year old child was being raped without uttering a single word in his defense. Moreover, at that time there did not appear to be any danger to the defendant. This conduct clearly falls within the *Walden* holding.

*Ainsworth,* 109 N.C.App. at 144, 426 S.E.2d at 415. Additionally, in responding to Mrs. Ainsworth's argument that her son, unlike the child in *Walden,* suffered no physical harm, the court wisely stated:

> While the threat of physical harm, including death, to the child in *Walden* was arguably more immediate than that here, it was no less severe. We would be blind to both the cold reality of today's world of sexually transmitted diseases and emotional damage resulting from sexual abuse if we were to hold that the child here was placed at any lesser risk than the child in *Walden.* Moreover, . . . the child here was exposed to an event which could have severe psychological repercussions requiring long term treatment.

*Id.* at 145, 426 S.E.2d at 416.

Returning to the case before us, taking into consideration the purpose of the child abuse statute, the amendments in which the Legislature generally expanded the scope of liability and actions constituting child abuse, this Court's holdings in *Fabritz* and *Pope,* and the modern trend in broadly recognizing and punishing all forms of child abuse,[11] we believe the

---

11. For a discussion on the legal trends and various approaches by the states in holding parents criminally responsible for condoning the abuse

definition of sexual abuse in section 35C contemplates not just an affirmative act in directly molesting or exploiting a child, but one's omission or failure to act to prevent molestation or exploitation when it is reasonably possible to act and when a duty to do so, such as in this case, exists.

Not only does the definition of sexual abuse include an omission or failure to act when a child is being sexually abused, but the definition itself encompasses what petitioner actually did: the affirmative acts of watching and failing to intervene in the rape. We noted, *supra*, that the word "involves" tends to modify the word "act" in the statutory definition, implying that the Legislature intended to punish not only the deed of molestation or exploitation, but actions that relate to molestation or exploitation. There was evidence, if believed by the trier of fact, as apparently it was, that on two occasions, once in late June and once on August 10, petitioner not only knew her husband was engaged in sexual intercourse with Jennifer, but sat on the same bed and watched. Although petitioner denied the June episode when she allegedly said to her husband "she really didn't care" whether he had sex with Jennifer, she also testified that on August 10, Jennifer came into the couple's room while they were in bed watching television and asked to have sex with Mr. Degren. Petitioner said she did not interfere because at times her husband could be abusive.[12] Additionally, both

of their children, see Christine Adams, Note, *Mothers Who Fail to Protect Their Children From Sexual Abuse: Addressing the Problem of Denial*, 12 Yale L. & Pol'y Rev. 519, 524–33 (1994).

12. This Court is not blind to the unfortunately all too common battered-spouse scenario in which persons with abusive spouses decline to act or protect themselves or others for fear of a violent retaliation by their spouses. In this particular context and from the facts presented in the record, however, petitioner did not appear to be in any immediate threat of danger. She testified, when asked why she did not stop her husband from having sex with Jennifer: "Because my husband at times is abusive to me, and I did not do anything about it because I was afraid that he would hit me." There was no evidence in this record of any such abuse during this or any other instance. We do not believe that reliance on that brief statement constituted sufficient evidence of the battered spouse syndrome.

Jennifer and petitioner testified that petitioner was aware of and witnessed Rick and Jennifer engaged in sexual intercourse in the Degren's home on August 14. Petitioner disputed Jennifer's claim that she was involved in the act. Nonetheless, petitioner did not try to intervene or protect the child. These acts of watching Rick and her husband engage in sexual intercourse with Jennifer, even if one believes petitioner herself did not engage in sexual contact with the child, are acts involving the molestation or exploitation of Jennifer. By watching the rapes and failing to take action to prevent them, and in affirmatively responding that she "really didn't care," petitioner participated in the molestation and exploitation of a minor by allowing sexual intercourse between Jennifer and the two men to occur. *See Brackins v. State*, 84 Md.App. 157, 162, 578 A.2d 300, 302 (1990) ("To be convicted of exploitation and, therefore, child abuse, threats, coercion, or subsequent use of the fruits of the acts are not necessary. The State need only prove, beyond a reasonable doubt, that the parent or person having temporary or permanent custody of a child took advantage of or unjustly or improperly used the child for his or her *own* benefit.").

■ Petitioner next argues that, under the doctrine of *ejusdem generis*, the plain meaning of the child abuse statute supports her contention that the Legislature did not intend to penalize one's failure to act in preventing or stopping sexual abuse. In her brief, petitioner argues:

> While § 35(a)(6)(i) [sic] defines the term "sexual abuse," § 35C(a)(6)(ii) lists some examples of it, specifically, incest, rape, sexual offense in any degree, sodomy, and unnatural or perverted sexual practices. When a statute contains an enumeration of specific examples of a class along with a general description of the class, the rule of *ejusdem generis* requires that the general words "be construed to include only those things or persons of the same class or general nature as those specifically mentioned." *In re Wallace W.*, 333 Md. 186, 190, 634 A.2d 53 (1993) (citation omitted).

 This Court explained the doctrine of *ejusdem generis* in *Smith v. Higinbothom,* 187 Md. 115, 130, 48 A.2d 754, 761–62 (1946):

[U]nder the established rule of *ejusdem generis* [,] where general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned. This rule is based on the supposition that if the Legislature had intended the general words to be considered in an unrestricted sense, it would not have enumerated the particular things.

More recently, we stated in *In re Wallace W.,* 333 Md. at 190, 634 A.2d at 55–56 (quoting 2A SUTHERLAND STAT. CONST. § 47.18, at 200 (5th ed.1992) (footnote omitted)):

"The doctrine of ejusdem generis applies when the following conditions exist: (1) the statute contains an enumeration by specific words; (2) the members of the enumeration suggest a class; (3) the class is not exhausted by the enumeration; (4) a general reference supplementing the enumeration, usually following it; and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires. It is generally held that the rule of ejusdem generis is merely a rule of construction and is only applicable where legislative intent or language expressing that intent is unclear."

*See also Rucker v. Harford County,* 316 Md. 275, 295, 558 A.2d 399, 408–09 (1989). The doctrine cannot be invoked, however, "to restrict the meaning of words within narrower limits than the statute intends, so as to subvert its obvious purpose." *Blake v. State,* 210 Md. 459, 462, 124 A.2d 273, 274 (1956). *See also Wesley Chapel Bluemount Ass'n v. Baltimore County,* 347 Md. 125, 147, 699 A.2d 434, 445 (1997); *State Dept. of Assessments and Taxation v. Belcher,* 315 Md. 111, 121, 553 A.2d 691, 696 (1989); *Higinbothom,* 187 Md. at 130, 48 A.2d at 762.

We decline to utilize the doctrine of *ejusdem generis* in construing this statute. Section 35C(a)(6)(ii) enumerates actions describing types of sexual abuse, but the general phrase, "Sexual abuse includes, but is not limited to" precedes the enumerated list and states specifically that the list is not exhaustive. (Emphasis added.) Furthermore, given general legislative policy and the purpose of the child abuse statute to protect minors from abuse, we find it difficult to believe the General Assembly chose to limit the forms of sexual abuse punishable to only those listed in section 35C(a)(6)(ii). Therefore, exercising *ejusdem generis* in this context would limit the meaning of sexual abuse and "subvert its obvious purpose." *Blake*, 210 Md. at 462, 124 A.2d at 274.

In sum, for all of the foregoing reasons, we hold that petitioner's failure or omission to act in allowing Jennifer to be raped, molested, and exploited, constituted sexual abuse pursuant to section 35C.

### IV. Prosecutor's Comment During Closing Argument

In his closing argument, the defense counsel stated the following:

Ladies and gentlemen, one of the things that the Court has told you to consider is ... whether the witness might have a motive not to tell the truth. Would Jennifer have a motive to accuse Sharon? Now, consider, ladies and gentlemen, if you please, where Jennifer saw Sharon as a rival for Nicholas's attention. We heard what she said to Lori Owens. We heard from the State's bargain witness, Mr. Dobsha, that Jennifer had said that she really wanted Nicholas but Dobsha was there so she will do it with him. She saw Sharon as a rival for Nicholas's attention.

In rebuttal, the State's Attorney said:

The bottom line is really—even if you believe everything that was argued the defendant is guilty of child abuse. She had a duty to stop what was going on even if she wasn't participating in it. But why should you not believe her when she tells you that she wasn't participating in it? The

number one reason why you should not believe what Sharon DeGren says is nobody, *nobody in this country has more reason to lie than a defendant in a criminal trial.*

[Petitioner's defense attorney] told you about motives to lie. The Judge told you you can consider that. He gave a ridiculous motive for Jennifer to lie. But this defendant has every reason to lie. She is a defendant. Other reasons why you should not believe the defendant, her testimony is inconsistent with her statement. [Emphasis added.]

Petitioner did not object at the time the statements were made but moved for a mistrial after closing arguments, arguing the statement contradicted the presumption of innocence afforded criminal defendants. The trial judge denied this motion. Petitioner's attorney then asked for a curative instruction that the jury disregard the statement, which the trial judge also denied.[13]

In its opinion below, the Court of Special Appeals held that, although the prosecutor's comment was inappropriate, the trial court did not abuse its discretion in allowing her to make the above comments to the jury. Petitioner argues that under this holding the intermediate appellate court found the trial court erred, and now attempts to persuade this Court that the error was not harmless. The State, on the other hand, counters that the trial court did not abuse its discretion in denying the remedies requested by petitioner and, in any event, the comments did not prejudice petitioner.

We begin our discussion with the general rule that attorneys are afforded great leeway in presenting closing arguments to the jury. *Henry v. State,* 324 Md. 204, 230, 596 A.2d 1024, 1037 (1991), *cert. denied,* 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992); *Jones v. State,* 310 Md. 569, 580, 530 A.2d 743, 748 (1987), *vacated and remanded on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916, *sentence vacated on remand on other grounds,* 314 Md. 111, 549 A.2d 17 (1988). "The prosecutor is allowed liberal free-

---

**13.** The record reflects that these matters were conducted at the bench.

dom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom." *Jones*, 310 Md. at 580, 530 A.2d at 748. *See also Grandison v. State*, 341 Md. 175, 224, 670 A.2d 398, 421–22 (1995); *Oken v. State*, 327 Md. 628, 676, 612 A.2d 258, 281 (1992), *cert. denied*, 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *Collins v. State*, 318 Md. 269, 279, 568 A.2d 1, 5–6, *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990). In this regard,

[g]enerally, . . . the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the [prosecution] produces.

While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.

*Wilhelm v. State*, 272 Md. 404, 412–13, 326 A.2d 707, 714 (1974) (citations omitted) (second alteration in original).

 Despite the wide latitude afforded attorneys in closing arguments, there are limits in place to protect a defendant's right to a fair trial. *See id.* at 413–15, 326 A.2d at 714–15. Not every improper remark, however, necessarily mandates reversal, *Hunt v. State*, 321 Md. 387, 435, 583 A.2d 218, 241 (1990); *Jones*, 310 Md. at 580, 530 A.2d at 748; *Wilhelm*, 272 Md. at 415, 326 A.2d at 715, and "[w]hat exceeds the limits of permissible comment depends on the facts in each

case." *Wilhelm,* 272 Md. at 415, 326 A.2d at 715. We have said that "[r]eversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused." *Jones,* 310 Md. at 580, 530 A.2d at 748. This determination of whether the prosecutor's comments were prejudicial or simply rhetorical flourish lies within the sound discretion of the trial court. *Grandison,* 341 Md. at 225, 670 A.2d at 422; *Wilhelm,* 272 Md. at 413, 326 A.2d at 714–15. On review, an appellate court should not reverse the trial court unless that court clearly abused the exercise of its discretion and prejudiced the accused. *Hunt,* 321 Md. at 435, 583 A.2d at 241; *Wilhelm,* 272 Md. at 413, 326 A.2d at 714–15.

Petitioner contends the trial court erred in not providing some remedy in response to the prosecutor's comments that "[t]he number one reason why you should not believe what Sharon DeGren says is nobody, nobody in this country has more reason to lie than a defendant in a criminal trial" and "this defendant has every reason to lie. She is a defendant." Those comments, petitioner argues, effectively undermined the bedrock principle that a defendant is presumed innocent until proven guilty because the prosecutor's comment referred to criminal defendants in general and their motives to lie, not *this defendant's* motives.

The prosecutor's comment that criminal defendants have a motive to lie did not bear directly on petitioner's guilt or innocence. Rather, the comment was made in response to the defense counsel's comments during closing argument that the jury should not believe the State's witnesses because they had various motives to lie. The prosecutor went on, after she made her remarks at issue, to argue other motives petitioner might have to lie. This Court has held that, under certain circumstances, a prosecutor's argument during rebuttal and in response to comments made by the defense during its closing are proper. *See Blackwell v. State,* 278 Md. 466, 481, 365 A.2d 545, 553–54 (1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2183, 53 L.Ed.2d 229 (1977). *But see Johnson v. State,* 325 Md. 511, 517, 601 A.2d 1093, 1096 (1992). The trial court evidently

determined that the prosecutor's comments were not improper, at least to the extent that they did not subvert the presumption of innocence, the only ground for mistrial argued by petitioner's counsel. Given the broad discretion afforded trial courts in making such determinations, we do not believe it abused this discretion in denying petitioner's motions for mistrial and for a curative instruction.[14]

Additionally, notwithstanding that the trial court did not abuse its discretion in denying petitioner's motions and permitting the comments, the defendant suffered no prejudice. This Court has long held that in determining whether an error prejudiced the defendant, that is, whether the error was harmless, "the determinative factor . . . has been whether or not the erroneous ruling, in relation to the totality of the evidence, played a significant role in influencing the rendition of the verdict, to the prejudice of the [defendant]." *Dorsey v. State*, 276 Md. 638, 653, 350 A.2d 665, 674 (1976). *See also Evans v. State*, 333 Md. 660, 679, 637 A.2d 117, 126 (1994) ("[T]he mere fact that a remark made by the prosecutor to the jury was improper does not necessarily require a conviction to be set aside. Reversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused." (quoting *Jones,* 310 Md. at 580, 530 A.2d at 748)).

First, the comments in this case do not rise to the level of, for example, the prosecutor's comments in *Shoemaker v. State,* 228 Md. 462, 469, 180 A.2d 682, 685 (1962). In that case, the prosecutor in his closing argument referred to the possibility that the defendant might receive parole if convicted. This

---

14. In so holding, we, like the Court of Special Appeals, believe this comment may have been inappropriate. Under the facts of this particular case, the issue of motive to lie had been brought up first by the defense. We do not believe the State's Attorney's intent in stating criminal defendants have a motive to lie was nefarious. Nonetheless, it was an unprofessional and injudicious remark. We do not condone such comments and do not hold that in future cases and under different facts, such remarks always will be acceptable.

comment, we said, might have shifted the jury's perceived responsibility in finding the defendant guilty to some other body. *See also Johnson*, 325 Md. at 519, 601 A.2d at 1096–97. In the case at hand, the prosecutor generalized that criminal defendants have a motive to lie. This statement is not entirely true or untrue; criminal defendants may or may not have a motive to lie. What is clear is that the statement does not imply that the defendant is not presumed innocent. Guilt or innocence may or may not have anything to do with the motive to lie. More importantly, the prosecutor continued in her rebuttal to discuss other motives petitioner had to lie.

Further, although prosecutors normally cannot comment in closing argument on matters not in evidence, *Evans*, 333 Md. at 679, 637 A.2d at 126, the comment addressed issues raised during the case-in-chief, namely, petitioner's testimony and her motives to lie. Additionally, as we have said, prosecutors may address during rebuttal issues raised by the defense in its closing argument. *See Blackwell*, 278 Md. at 481, 365 A.2d at 553–54. Taken in context, the prosecutor's comments directly referred to the issue of motives to lie first raised by defense counsel; the comments were not an attempt to negate the presumption, nor did they defeat the presumption, that criminal defendants are presumed innocent until proven otherwise.

Even though the trial court declined to provide the jury with curative instructions regarding the prosecutor's comments because it perceived no error to rectify, the jury was instructed by the trial court immediately preceding closing arguments of its duties and the roles of the attorneys and the evidence. In its instructions, the court stated:

As we said yesterday, *Ms. DeGren comes here presumed to be innocent, not guilty, of these charges.* That presumption remains with her throughout every stage of the trial and is not overcome unless you are convinced beyond a reasonable doubt that she is guilty of something. The State has the burden of proving guilt beyond a reasonable doubt. That burden remains with the Government throughout the trial. *The defendant is not required to prove her innocence.* She isn't required to prove her innocence at all.

. . . .

Obviously you are expected to consider this case and decide it fairly and impartially and to perform that duty without bias or prejudice towards any party. You should not be swayed by sympathy, prejudice or your perception of public opinion.

As we have been saying, the case has to be decided *solely upon the evidence presented in the courtroom.* Evidence consists of testimony that you have heard from people who have taken an oath and sat there and have been questioned. . . .

. . . .

The questions and the objections stated by counsel that you heard as such are not evidence either. It is the function of the lawyers, obviously, to ask questions and to raise objections in their effort to focus the evidence in the direction that they think it should go. *Any comments I made here, as I have said, are not evidence.* Any comments the lawyers are about to make to you are not evidence. What the lawyers have said to you already is not evidence. . . .

. . . .

You alone are the judge of whether witness testimony should be believed and what witness testimony should be believed. Again, in evaluating witness testimony you are expected to apply your common sense and your everyday experiences. In determining whether or not to believe what a witness has said you should carefully judge all of the testimony and the evidence and the circumstances under which a witness has testified. . . . *Ask yourself whether a witness has a motive not to be truthful, whether the witness has an interest in the outcome of this case, whether the witness' testimony was essentially consistent, whether it was supported or contradicted by other evidence that you believe, whether and to what extent the witness' testimony in the courtroom here today was consistent with or differ-*

*ent from statements that he may have made to other people on other occasions.* [Emphasis added.]

The court's instructions clearly define the jury's role, the presumptions afforded the defendant, how to consider comments by the attorneys, and how to judge witness testimony. Given the breadth of these instructions, we do not believe the prosecutor's comment during rebuttal, even if inappropriate, had any effect on the presumption of innocence or any other instructions previously given by the trial court. The jury likely understood the comment for what it was: the prosecutor's attempt to bring to light petitioner's motives to lie due to petitioner's interest in the outcome of her trial.

Finally, the jury's verdict in this matter demonstrates that it was not persuaded by the prosecutor's remarks. Petitioner was charged and tried with several offenses, including rape and second degree and third degree sexual offenses, for her alleged direct involvement with the molestation of Jennifer, conspiracy, and the charges relating to her failure to prevent or stop the molestations by her husband and Rick. In her testimony, petitioner denied participating in oral sex with Jennifer or using a vibrator on the child. Petitioner admitted to most of the other instances in which Jennifer claimed petitioner was present and failed to stop the men from molesting her. The jury ultimately convicted petitioner only of the offenses in which she had admitted her presence. Evidently, the jury believed some of petitioner's testimony and disbelieved some of Jennifer's testimony because it found petitioner guilty of child abuse for her conduct relating to her failure to prevent the rapes but not for the sexual acts she allegedly committed upon Jennifer. Accordingly, given the multitude of crimes with which petitioner was charged, her own admissions, the charges with which she ultimately was convicted, and all of the other reasons discussed above, this Court does not believe the prosecutor's comments or the trial court's failure to rectify any perceived error actually prejudiced petitioner. Therefore, a reversal is not warranted under these circumstances.

Several other courts have reached comparable results with respect to similar issues. *See People v. Rice*, 234 Ill.App.3d 12, 26, 175 Ill.Dec. 239, 599 N.E.2d 1253, 1263, 1264, *appeal denied*, 147 Ill.2d 635, 180 Ill.Dec. 156, 606 N.E.2d 1233 (1992) (noting that "[i]t is not improper to call the defendant or a witness a 'liar' if conflicts in evidence make such an assertion a fair inference" and, in any event, based upon the overwhelming evidence of guilt, the defendant was not prejudiced by prosecutor's remarks); *People v. Thomas*, 200 Ill.App.3d 268, 276, 146 Ill.Dec. 693, 558 N.E.2d 656, 662, *appeal denied*, 133 Ill.2d 569, 149 Ill.Dec. 334, 561 N.E.2d 704 (1990) (reasoning that where the prosecutor's remark during closing argument about the defense counsel's failure to call a witness was invited by a similar comment from the defense counsel, the prosecutor's remark was not improper); *Commonwealth v. Johnson*, 527 Pa. 118, 127, 588 A.2d 1303, 1307 (1991) (holding that prosecutor's comments during closing argument that the defendant had lied were neither unfair nor prejudicial when made in response to defense counsel's comments regarding credibility of the victim, were supported by evidence, and because defense counsel clearly indicated belief that the prosecution witness was lying). *See also United States v. Young*, 470 U.S. 1, 19–20, 105 S.Ct. 1038, 1048–49, 84 L.Ed.2d 1 (1985) (holding that prosecutor's comments during rebuttal argument expressing his personal opinion about the defendant's guilt, although error, did not prejudice defendant because "overwhelming evidence ... eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations.").

## V. Conclusion

The trial court did not err in holding that petitioner, an adult with responsibility for the supervision of Jennifer, was guilty of sexual abuse for her failure to prevent the sexual molestation or exploitation of Jennifer. Taking into consideration the legislative intent and purpose of the child abuse statute, we hold that the definition of sexual abuse includes an omission or failure to act such as occurred in this case. In

addition, by watching and failing to intervene in the rape, petitioner's actions constituted affirmative acts of child abuse within the language of the statute because she facilitated or encouraged her husband's and Rick's molestation or exploitation of Jennifer.

Similarly, the trial judge did not err in allowing the prosecutor to tell the jury in closing argument that the "number one reason" for not believing petitioner's testimony is because "nobody in this country has more reason to lie than a defendant in a criminal trial." That comment was in response to an attack on the credibility of witnesses first raised by the defense counsel in his closing argument and was not necessarily improper. Therefore, the trial court's failure to rectify the comment was not an abuse of discretion because there was no error. Moreover, even if erroneous, the trial court's denial of petitioner's motions did not prejudice petitioner. The remarks clearly were made in response to the defense attorney's closing argument and did not defeat the presumption that all criminal defendants are innocent until proven guilty. Furthermore, the trial judge gave an exhaustive list of instructions addressing the presumption of innocence, the role of testimony and remarks by the attorneys, and motives to lie. Given all of these facts as well as the jury's ultimate verdict, the remarks did not prejudice petitioner.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**