**HEADNOTES:**

*Stanley Ray Winston v. State of Maryland*, No. 2838, September 2015; *Brian Cuffie Mayhew v. State of Maryland*, No. 70, September 2016; and *Anthony Cannon v. State of Maryland*, No. 74, September Term 2016.

Opinion by Arthur, J.

**CRIMINAL LAW—SEVERANCE—JOINDER OF MULTIPLE DEFENDANTS**

When deciding whether to sever a joint trial of multiple defendants, trial courts undergo a two-step analysis. The court first looks to see whether the evidence will be mutually admissible against all defendants, or, in other words, whether evidence admissible in one defendant's trial would be inadmissible in a co-defendant's trial. *State v. Hines*, 450 Md. 352, 376 (2016). If otherwise inadmissible evidence will be presented at the joint trial, the court examines whether this evidence is unfairly prejudicial to the co-defendant. *Id.* If the defendant would suffer unfair prejudice, the trial court must exercise its discretion and take remedial measures, such as ordering a severance, using limiting instructions, or redacting the prejudicial evidence to ensure a fair trial. *Id.* at 369-70.

Here, the judge gave an overly generous limiting instruction that prevented the jury from considering any evidence of prior murders committed by one of the defendants against the other two defendants who were not involved in those murders. While the evidence of the prior murders would have been admissible to explain motive in the co-defendants' separate trials for conspiracy to murder a witness to the other murders, the trial court's broad limiting instruction was sufficient to limit any potential unfair prejudice. Hence, the court's denial of a motion to sever the joint trial was not an abuse of discretion.

**CRIMINAL LAW—"OTHER CRIMES" EVIDENCE**

Rule 5-404(b) provides that "[e]vidence of other crimes, wrongs, or acts" is, in general, "not admissible to prove the character of a person in order to show action in conformity therewith." Rule 5-404(b) is designed to protect the person who committed the "other crimes, wrongs, or acts" from an unfair inference that he or she is guilty not because of the evidence in the case, but because of a propensity for wrongful conduct.

Here, two defendants objected to the court's admission of "other crimes" evidence relating to earlier murders committed by a third defendant. However, because neither defendant participated in the earlier murders, the evidence of those crimes could not have been introduced to show that they acted in conformity with some criminal propensity to commit murder. Hence, the defendants had no basis to invoke Rule 5-404(b).

**CRIMINAL LAW—AUTHENTICATION OF JAILHOUSE CALLS**

Defendants argue that to authenticate recordings of jailhouse telephone calls, the State was required to call a representative of the private company that stored the recordings. However, to meet the burden of authentication, a party need not rule out every theoretical possibility that the evidence is something other than what he or she says it is. By introducing witnesses who could identify the defendants' voices on the recordings, the State met the undemanding burden of authentication.

## CRIMINAL LAW—HEARSAY—PLAIN ERROR EXCEPTION

Defendants argued, albeit only in their briefs, and not at trial, that the State could not use Md. Rule 5-803(a)(5), the exception to the hearsay rule for statements by a co-conspirator, because it failed to establish when the alleged conspiracy began. Defendants argued that the plain error doctrine permits our review of this unpreserved argument.

The defendants failed to identify what statements were inadmissible hearsay. Hence, we are unable to determine whether any alleged error, if any, affected the outcome or whether it seriously undermined the fairness, integrity, or reputation of the proceedings. Even were we to address defendants' argument, the evidence suggests that the conspiracy began when the defendants established a clandestine, back-channel means of communicating. The clandestine communications themselves are evidence of a conspiracy that began at least as early as the first communication.

## CRIMINAL LAW—MOTION FOR MISTRIAL

Defendants moved for a mistrial when the State played a brief excerpt of a recording that the trial court had arguably ordered redacted on the grounds that the excerpt was hearsay not within the co-conspirator exception, Md. Rule 5-803(a)(5), because the object of the conspiracy, a murder, had already occurred.

In this case, the mistrial motion was based on a fallacious premise. In playing the recording, the State was not attempting to evade the court's earlier ruling and to admit the defendant's statement to prove the truth of the matter asserted. Instead, the State played the recorded statement for the non-hearsay purpose of having its witness affirm that the voice on the recording was that of the defendant. Because there is no basis to find the recording inadmissible, the circuit court could not have abused its discretion in denying the motion for a mistrial.

## CRIMINAL LAW—CLOSING ARGUMENTS

Defendant argued that State "went beyond the pale of permissible advocacy," because "[t]here is absolutely no evidence to support . . . that [the defendant] threatened to kill [the victim's child]." At trial, however, the State presented witness testimony that, after an interaction between the victim and the defendant, the victim's behavior became "scared, more paranoid" and that the victim insisted on keeping his son close to him.

This evidence was sufficient for the State to argue that during this previous interaction the defendant threatened victim's son.

## CRIMINAL LAW—SUFFICIENCY OF THE EVIDENCE

Defendants argued that because no transcripts of the jailhouse call recordings were produced, there was insufficient evidence to uphold their convictions. This argument fails for a number of reasons. First, defendants' arguments are waived because they are not based on the same grounds they raised at trial. Next, defendant cannot ignore his obligation to produce transcripts and then rely on their absence to support his sufficiency of the evidence claims. Lastly, the State presented ample evidence for a rational trier of fact to convict the defendants. The State presented evidence of motive, voice recordings wherein the defendants orchestrated the murder (though in coded and veiled language), as well as cell phone tower records which implicated one of the defendants.

<u>REPORTED</u>

<u>IN THE COURT OF SPECIAL APPEALS</u>

<u>OF MARYLAND</u>

CONSOLIDATED CASES

No. 2838; September Term, 2015

_____

STANLEY RAY WINSTON
v.
STATE OF MARYLAND

_____

No. 70; September Term, 2016

_____

BRIAN CUFFIE MAYHEW

v.

STATE OF MARYLAND

_____

No. 74; September Term, 2016

_____

ANTHONY CANNON

v.

STATE OF MARYLAND

_____

Meredith,
Graeff,
Arthur,

JJ.

_____

Opinion by Arthur, J.

Concurring Opinion by Meredith, J.

_____

Filed: February 2, 2018

In this consolidated appeal, appellants Stanley Winston, Brian Mayhew, and Anthony Cannon challenge their convictions for first-degree murder and other related offenses. The convictions resulted from a multi-week jury trial in which the appellants were tried jointly for killing Mayhew's uncle, Nicoh Mayhew, in order to prevent him from testifying against Mayhew in another murder case.[1]  Because the circuit court did not err or abuse its discretion, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. The Murder of Nicoh Mayhew

On the morning of December 19, 2012, Cynthia Dinkins-Mayhew awoke to the sound of gunshots. When she heard her two-year-old grandson, M., crying outside of her apartment, she opened the front door. She saw her son, Nicoh, lying dead on the floor of the breezeway and her grandson sitting in a pool of blood with a gunshot wound to his arm. She grabbed the child and took him back into the apartment.

Police officers arrived and questioned Ms. Dinkins-Mayhew. She identified Brian Mayhew as a suspect, because Nicoh was scheduled to appear as a witness against him for the murders of Sean Ellis and Anthony McKelvin.

Oscar Saravia, a maintenance worker, was near Ms. Dinkins-Mayhew's apartment building at the time of the shooting. Through an interpreter, he testified that he saw two "slender . . . black" men in the parking lot "with gray, black jackets" and hoods covering their faces. The men "were observing the guy with his child . . . and waited for him to get

---

[1] For the sake of clarity, this Court will refer to Nicoh Mayhew as "Nicoh" and Brian Mayhew as "Mayhew."

out of the car with the boy[.]" When Nicoh and his son were walking towards Ms. Dinkins-Mayhew's apartment building, Mr. Saravia said, "they started running out with a gun in hand." He heard gunshots and yelling. His account was corroborated by video surveillance footage, which was played for the jury.[2]

The surveillance video shows one of the men inspecting Ms. Dinkins-Mayhew's gold Hyundai seconds before Nicoh and his son arrived in a white Kia. In a recorded telephone call that Mayhew made from jail before Nicoh's murder, he had told Winston and Cannon that Ms. Dinkins-Mayhew had a gold Hyundai that was "banged up in the front." In another jailhouse call, on the day before the murder, Mayhew instructed Cannon to wait near the gold car in front of the apartment. In the same call, Mayhew used coded language ("a white girl named Kia"), to tell Cannon and Winston that Nicoh would arrive in a white Kia.

Mayhew attempted to conceal his participation in the jailhouse calls in several ways. First, he used another detainee's identification number to place the calls. Second, he would typically call his girlfriend, Asha Smythe, who would connect him via a third-party call to Cannon, Winston, and others, thereby preventing the authorities from learning the telephone numbers of the persons with whom he was speaking. The State introduced text messages in which Winston had instructed Smythe about how to set up

---

[2] The record on appeal does not contain the video-recording. We are left to rely on the testimony of Saravia and another witness, who narrate their perceptions of the video.

the third-party calls.[3]

In one jailhouse call, a week before Nicoh's murder, Mayhew instructed Winston and Cannon to "[c]hill until you see something and then we snap it up." Mayhew gave a description of where he wanted "this incident to happen," which coincided with a description of the outside of Ms. Dinkins-Mayhew's apartment ("[t]he first flight up, . . . straight back to your right"). In another call, Mayhew said something about "9 to 11," which was a reference to when Nicoh would arrive with his son at his mother's apartment.[4]

On December 16, 2012, three days before the murder, Mayhew spoke to Nicoh and told him, "Nicoh, I love you." Six minutes after the call ended, Mayhew called Winston to discuss the hit on Nicoh.

In a call on the day before the murder, Mayhew instructed Winston to coordinate a three-way call with Cannon. During that call, Mayhew said that it was "show time tomorrow." In that same call, one of the participants referred to "S and W," meaning "Smith & Wesson."

In yet another call, which appears from its context to have occurred after the murder, one of the participants made an oblique reference to Nicoh's son, M., saying, "It

---

[3] To identify the participants in the recorded calls, the State was required to call witnesses who were familiar with their voices. The record does not contain a transcript of the calls. Nor does it contain the recordings themselves. To ascertain what occurred in the calls, we must rely on the State's descriptions of them in its closing argument.

[4] The murder happened at 9:54 a.m.

didn't get in the way."

The State introduced evidence showing that within 10 minutes of the murder Cannon's telephone[5] used cell phone towers near Ms. Dinkins-Mayhew's apartment in Seat Pleasant. That phone had not used those towers at all in the two months before the murder.

After the murder, Cannon and Winston exchanged text messages in which they included a picture of a Washington Post article about the murder.

### B. The Murders of Sean Ellis and Anthony McKelvin

The State alleged that Mayhew had conspired with Cannon and Winston to kill Nicoh because he wanted to prevent Nicoh from testifying against him in a criminal case in which he was charged with murdering Sean Ellis and Anthony McKelvin.

Ellis and McKelvin had been shot to death on May 30, 2011. Days later, after the police had identified Nicoh as an accessory, he gave a recorded statement and testified before the grand jury that indicted Mayhew for the murders. *See Mayhew v. State*, No. 475, Sept. Term 2014 (filed Aug. 19, 2015), http://mdcourts.gov/appellate/unreportedopinions/2015/0475s14.pdf. Mayhew's trial for the Ellis and McKelvin murders was scheduled to begin in February 2013, a few weeks after Nicoh was killed.[6]

---

[5] The telephone belonged to one Tobias Dyer, but the State established that Cannon used it.

[6] Nicoh's death did not prevent the State from introducing his grand jury testimony against Mayhew. Md. Rule 5-804(b)(5)(B); Maryland Code (1974, 2013 Repl.

- 4 -

### C. Witness Intimidation

While awaiting trial for the murders of Ellis and McKelvin, Mayhew and his co-defendant, Kenan Myers, were jailed at the Prince George's County Detention Center. Nicoh's brother was jailed in the same housing unit at that time.

On November 27, 2012, Nicoh visited his brother at the detention center. During the visit, Mayhew and Myers were also in the visitor area. Mayhew asked the correctional officer if he could talk to Nicoh. The officer permitted him to do so and observed Mayhew, Myers, and Nicoh talking to each other for about a minute.

After his visit to the jail, Nicoh's girlfriend described him as "scared, more paranoid . . . [and] [w]orried that somebody was, like, going to do something to him." Nicoh's mother similarly described Nicoh as "scared." She added that he "didn't want to leave the baby."[7] In a jailhouse call, one of the conspirators remarked that Nicoh was "camouflaging" himself ("you're dealing with a dude who be camouflaging for real").

In the months leading up to Mayhew's trial for the Ellis and McKelvin murders, the lead detective had difficulty locating Nicoh. The detective had to call Nicoh's mother or girlfriend in order to reach him. According to the detective, Nicoh appeared to be avoiding him.

Nicoh was scheduled to meet with the detective during the week after Christmas.

_____

Vol.), § 10-901 of the Courts and Judicial Proceedings. Mayhew was eventually convicted of the Ellis and McKelvin murders.

[7] Ms. Dinkins-Mayhew volunteered that Nicoh told her why he did not want to leave the baby, but the court correctly refused to permit her to offer hearsay testimony about what he allegedly said.

He was gunned down on December 19, 2012.

### D.  The Trials

The case against Cannon, Mayhew, and Winston initially went to trial on June 29, 2015.  The jury, however, was unable to reach a verdict.  Consequently, on July 8, 2015, the court declared a mistrial.

The State elected to retry Cannon, Mayhew, and Winston, and a second trial began on February 1, 2016.  After nine days of testimony, the jury returned a verdict of guilty on all counts.

The court sentenced Mayhew to life imprisonment without the possibility of parole, plus a consecutive 105 years (of which 10 were to be served without the possibility of parole).[8]  The sentences were to run concurrently with the sentence of life

---

[8] The court specifically imposed the following sentences:

Count 1 (first-degree murder of Nicoh): life without the possibility of parole.
Count 2 (use of a handgun in a crime of violence – first-degree murder): 20 years, consecutive to Count 1 (the first five to be served without the possibility of parole).
Count 3 (conspiracy to commit first-degree murder): life, concurrent with Count 1.
Count 5 (inducing false testimony): 20 years, consecutive to Counts 1 and 2.
Count 9 (retaliation against a witness): 20 years, concurrent with Count 5.
Count 11 (witness intimidation): 20 years, consecutive to Counts 1, 2, and 5.
Count 18 (first-degree assault on M.): 25 years, consecutive to count 11.

imprisonment plus 20 years that the court had previously imposed on Mayhew for the murders of Ellis and McKelvin.

The court sentenced Cannon and Winston to life imprisonment, plus a consecutive 105 years (of which 10 were to be served without the possibility of parole).[9] The sentences were to run consecutively to any other sentences that Cannon and Winston were serving.[10]

_____

Count 19 (use of handgun in a crime of violence – first-degree assault): 20 years concurrent with Count 18 (the first five to be served without the possibility of parole).

[9] The court specifically imposed the following sentences:

Count 1 (first-degree murder of Nicoh): life.
Count 2 (use of a handgun in a crime of violence – first-degree murder): 20 years, consecutive to Count 1 (the first five to be served without the possibility of parole).
Count 3 (conspiracy to commit first-degree murder): life, concurrent with Count 1.
Count 4 (conspiracy to induce false testimony): 20 years, consecutive to Counts 2 and 3.
Count 6 (retaliation against a witness): 20 years, concurrent with Count 4.
Count 7 (witness intimidation): 20 years, consecutive to Counts 2, 3, and 4.
Count 13 (first-degree assault on M.): 25 years, consecutive to count 7.
Count 14 (use of handgun in a crime of violence – first-degree assault): 20 years consecutive to Count 13 (the first five to be served without the possibility of parole).

[10] At sentencing, Cannon's counsel told the court that his client was serving a 60-year sentence in a federal prison, that he was about to be sentenced in another federal case, and that he was facing trial in yet another federal case. The State told the court that Winston was serving a 60-year sentence in a federal prison for robbing a bank, with Cannon.

Winston, Mayhew, and Cannon noted timely appeals.

We shall provide additional facts as necessary in our discussion of some of the issues presented.

## QUESTIONS PRESENTED

In this consolidated appeal, Cannon, Winston, and Mayhew present a total of seven issues.

Cannon presents the following two questions:

1. Did the circuit court err in denying motions for severance?

2. Did the circuit court err in admitting "other crimes" evidence concerning the Ellis and McKelvin murders? [11]

Cannon and Winston both present two additional questions:

3. Did the circuit court err in admitting recordings of jailhouse calls without proper authentication?

4. Did the circuit court err in admitting hearsay statements under the co-conspirator exception when the State has not specified when the conspiracy began?

Mayhew joins in Question 3 (regarding the authentication of the recordings) and presents two additional questions:

5. Did the circuit court err in denying a motion for a mistrial when the State allegedly violated an earlier evidentiary ruling by playing a recording, made after the conspiracy had ended, of Cannon saying Winston's name?

6. Did the circuit court err in overruling an objection to the State's argument, in rebuttal closing, that Mayhew had threatened to injure Nicoh's child, M.?

---

[11] In his brief, Winston joined in Question 1 and Question 2, but he abandoned them at oral argument.

Finally, Cannon and Mayhew, but not Winston, question whether the evidence was insufficient to support their convictions.

For the reasons that follow, we answer all questions in the negative. Consequently, we shall affirm the convictions against Winston, Mayhew, and Cannon.

## DISCUSSION

### I. SEVERANCE

After the cases against the three co-conspirators were joined, Cannon and Winston moved to sever the cases against them from the case against Mayhew. As the basis for their motion, Cannon and Winston principally cited the circuit court's decision to permit the State to introduce details about the murder of Ellis and McKelvin, in which Mayhew alone was implicated. The circuit court denied the motion to sever.

In criminal trials, issues of joinder and severance are governed by Rule 4-253. That rule permits the joinder of related charges against multiple defendants, as well as the joinder of multiple charges against a single defendant. "If it appears," however, "that any party will be prejudiced by the joinder for trial of counts, charging documents, or defendants, the court may, on its own initiative or on motion of any party, order separate trials of counts, charging documents, or defendants, or grant any other relief as justice requires." Md. Rule 4-253(c).

In attacking the circuit court's decision not to order separate trials of the charges against him and the charges against Mayhew, Cannon begins his analysis with *McKnight v. State*, 280 Md. 604 (1977). *McKnight* is inapposite, because it concerns the joinder of multiple charges against a single defendant, not the joinder of related charges against

multiple defendants.

*McKnight* held that in a jury trial "a defendant charged with similar but unrelated offenses is entitled to a severance where he establishes that the evidence as to each individual offense would not be mutually admissible at separate trials." *Id.* at 612. In reaching its decision, the Court explained that, "where offenses are joined for trial because they are of similar character, but the evidence would not be mutually admissible, the prejudicial effect is apt to outweigh the probative value of such evidence." *Id.* at 610. On the other hand, "[w]here evidence of one crime would be admissible at a separate trial on another charge, a defendant will not suffer any additional prejudice if the two charges are tried together." *Id.* *McKnight* has been interpreted to mean that it is per se prejudicial not to sever multiple charges against a single defendant unless the evidence as to each individual offense would be mutually admissible in separate trials. *State v. Hines*, 450 Md. 352, 371 (2016).

Based on the questionable premise that no evidence of the Ellis and McKelvin murders would have been mutually admissible against him if he were tried separately for his role in Nicoh's murder, Cannon contends that the circuit court erred in denying his motion for severance. His argument fails, first, because mutual inadmissibility mandates severance only in cases that involve the joinder of multiple charges against a single defendant, not in cases involving the joinder of related charges against multiple defendants.

In cases like this, which involve the joinder of related charges against multiple defendants, a different standard applies. *See State v. Hines*, 450 Md. at 372-76. If the

State introduces evidence that is inadmissible against one of several co-defendants, it is conceivable that that defendant may suffer no unfair prejudice, because the evidence may not "implicate or even pertain to that defendant." *Id.* at 375-76. Hence, in cases involving several co-defendants, the trial judge is not required to order a severance merely because some evidence would not be mutually admissible against every co-defendant; instead, the judge must "determine whether the admission of such evidence will cause unfair prejudice to the defendant who is requesting a severance." *Id.* at 369; *see id.* at 376 ("the defendant must show that non-mutually admissible evidence will be introduced *and* that the admission of such evidence will result in unfair prejudice") (emphasis in original). If those two conditions are met, the judge must then "use his or her discretion to determine how to respond to any unfair prejudice caused by the admission of non-mutually admissible evidence." *Id.* at 369-70. "The Rule permits the judge to do so by severing the offenses or the co-defendants, or by granting other relief, such as, for example, giving a limiting instruction or redacting evidence to remove any reference to the defendant against whom it is inadmissible." *Id.* at 370.

Cannon is incorrect in asserting that the evidence of the Ellis and McKelvin murders would have been categorically inadmissible against him had he been afforded a separate trial: the murders of Ellis and McKelvin were relevant to explain his motive for conspiring with Winston and Mayhew to kill Nicoh, the person who had testified against Mayhew in those murders. Cannon did not suffer unfair prejudice from the admission of

- 11 -

relevant evidence concerning his motivation for the criminal conspiracy.[12]

Cannon appears to argue that some details of the Ellis and McKelvin murders would not have been admissible against him in a separate trial, or perhaps that the details were unfairly prejudicial to him. To the extent that he advanced such an argument below, however, the circuit court responded appropriately. In instructing the jury, the court stated that "[s]ome of the evidence was admitted against one defendant, Brian Mayhew[,] and not against the other defendants, specifically evidence related to the charges against Mr. Mayhew for the murder of Sean Ellis and Anthony McKelvin." The court went on to instruct the jurors that they "must consider such evidence only as it relates to the defendant against whom it was admitted, that being Mr. Mayhew[,] and not as to Mr. Cannon or Mr. Winston." As the State observes, this cautionary instruction actually gave Cannon more protection than he deserved, because it could be read to imply that no evidence of the Ellis and McKelvin murders was admissible against him for any purpose – even for the purpose of proving his motivation to conspire with Mayhew and Winston to murder Nicoh.[13]

---

[12] Cannon argues that the State could not have introduced any evidence of the Ellis and McKelvin murders had he conceded that Mayhew had a motive to murder Nicoh. The argument is unmeritorious, because the State would not have been required to accept any such concession had it been made. To the contrary, the State would have been free to reject the concession and to prove the issue of motive with whatever admissible evidence it had at hand.

[13] Cannon briefly argues that the evidence that Mayhew threatened Nicoh when Nicoh visited his brother in jail in November 2012 would also have been inadmissible against him in a separate trial for conspiring with Mayhew and Winston to murder Nicoh. His argument seems to suppose that the threat was hearsay, which would have been

In some circumstances, a cautionary instruction may not adequately protect a defendant from the risk of unfair prejudice resulting from the introduction of evidence that is admissible only against a co-defendant. For example, in *State v. Hines*, 450 Md. at 383-34, the Court held that a cautionary instruction could not adequately protect Hines from the unfair prejudice that he suffered when the State played a video-recording of an interrogation, in which his co-defendant repeatedly told obvious lies to conceal Hines's involvement in their crimes, and the investigators repeatedly insinuated that the co-defendant was lying to protect Hines. Because "it would have been practically impossible for the jurors" to disregard the inadmissible evidence in which the co-defendant and the investigators repeatedly implicated Hines, the Court held that the circuit court should either have redacted those portions of the interrogation or severed the trials. *Id.*

In this case, by contrast, Cannon offers little basis to conclude that the cautionary instruction, which was already broader than he was entitled to receive, was insufficient to protect him from the danger of unfair prejudice. Unlike the inadmissible evidence in

inadmissible under the co-conspirator exception to the hearsay rule (Md. Rule 5-803(a)(5)), because, he says, the conspiracy had not yet begun at the time of the threat. Cannon's contention is incorrect, because Mayhew's threat was not hearsay (i.e., it was not an out-of-court statement "offered in evidence to prove the truth of the matter asserted" (Md. Rule 5-801(c)), but rather a verbal act – a statement whose significance lies solely in the fact that it was made. 6A Lynn McLain, *Maryland Evidence: State and Federal* § 801.14(c)(i), at 265 (6th ed. 2013); *United States v. Jones*, 663 F.2d 567, 571 (5th Cir. 1981) (in prosecution for threatening court officers, threatening words were "paradigmatic nonhearsay"). In addition, the threat might also have been admissible for the nonhearsay purpose of establishing its effect on the listener, Nicoh. 6A Lynn McLain, *Maryland Evidence: State and Federal*, *supra*, § 801.14(c)(ii), at 266-68.

*Hines*, the evidence of the details of the Ellis and McKelvin murders did not implicate Cannon in those crimes in any way. To the contrary, the evidence focused on Mayhew's role, including the extent to which Nicoh's testimony would have established Mayhew's guilt. The Court's concerns in *Hines* are not present in this case.

In summary, the circuit court did not abuse its discretion in declining to sever Cannon's case from Mayhew's on account of the evidence concerning the murders of Ellis and McKelvin. At least some of the evidence unquestionably would have been admissible in separate trials. Furthermore, to the extent that some details of the murders might not have been admissible against Cannon had he been tried separately from Mayhew, the court satisfactorily addressed the potential problem of unfair prejudice by instructing the jury to consider the evidence only against Mayhew.[14]

## II.    "OTHER CRIMES" EVIDENCE

In a related challenge, Cannon argues that the evidence of the Ellis and McKelvin murders amounted to proof of "other crimes, wrongs, or acts" under Md. Rule 5-404(b). Proceeding from that premise, Cannon faults the circuit court for not employing the

---

[14] Cannon argues that the denial of his motion for a severance violated his rights to due process. His argument is baseless. Under the analogous federal rule, the Supreme Court has held that a person does not have the automatic right to a severance even when co-defendants assert mutually antagonistic defenses. *Zafiro v. United States*, 506 U.S. 534, 537-39 (1993). In another effort to give his arguments a constitutional dimension, Cannon cites *Bruton v. United States*, 391 U.S. 123 (1968), which held that the Confrontation Clause of the Sixth Amendment generally prohibits the prosecution from introducing the "incriminating extrajudicial statements" of a nontestifying codefendant. *Bruton* has no bearing on this case, because none of the defendants made incriminating extrajudicial statements.

requisite three-part test for assessing whether evidence of "other crimes, wrongs, or acts" has "special relevance" such that it might be admissible. *See, e.g.*, *Hurst v. State*, 400 Md. 397, 408 (2007); *State v. Faulkner*, 314 Md. 630, 634-35 (1989).[15] Cannon misapprehends the purpose of Rule 5-404(b).

Under Rule 5-404(b), "[e]vidence of other crimes, wrongs, or acts" is, in general, "not admissible to prove the character of a person in order to show action in conformity therewith." "The primary concern underlying the Rule is a 'fear that jurors will conclude from evidence of other bad acts that the defendant is a "bad person" and should therefore be convicted, or deserves punishment for other bad conduct and so may be convicted even though the evidence is lacking.'" *Hurst v. State*, 400 Md. at 407 (quoting *Harris v. State*, 324 Md. 490, 496 (1991)).

Nonetheless, evidence of a defendant's other wrongs "may be admitted if the evidence is substantially relevant to some contested issue in the case and is not offered to prove guilt based on propensity to commit crimes." *Id.* For example, "[s]uch evidence . . . may be admissible" as "proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident." Md.

---

[15] Under the three-part test, the court must first decide whether the evidence had "special relevance," in that it falls within one of the exceptions in Rule 5-404(b), *Hurst v. State*, 400 Md. at 408 (citing *State v. Faulkner*, 314 Md. at 634), "such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident." Md. Rule 5-404(b). "Second, the court must decide 'whether the accused's involvement in the other crimes is established by clear and convincing evidence.'" *Hurst v. State*, 400 Md. at 408 (quoting *State v. Faulkner*, 314 Md. at 634). "Finally, the court must balance the necessity for, and the probative value of, the other crimes evidence against any undue prejudice likely to result from its admission." *Id.* (citing *State v. Faulkner*, 314 Md. at 635).

Rule 5-404(b).

Rule 5-404(b) is designed to protect the person who committed the "other crimes, wrongs, or acts" from an unfair inference that he or she is guilty not because of the evidence in the case, but because of a propensity for wrongful conduct. *Hurst v. State*, 400 Md. at 407; *see also Sessoms v. State*, 357 Md. 274, 281 (2000) (stating that Rule 5-404(b) is "designed to ensure that a defendant is tried for the crime for which he or she is on trial and to prevent a conviction based on reputation or propensity to commit crimes, rather than the facts of the present case"). Hence, in this case, Rule 5-404(b) would protect *Mayhew* from an inference that he must have orchestrated Nicoh's murder because he had a propensity for murder, having previously murdered Ellis and McKelvin.

As to Cannon, on the other hand, the policies underlying Rule 5-404(b) are completely inapplicable. Because Cannon was not involved in the Ellis and McKelvin murders, the evidence of those murders could not have been introduced to show that *he* acted in conformity with some criminal propensity to commit murders. *See United States v. Morano*, 697 F.2d 923, 926 (11th Cir. 1983).

On facts similar to these, numerous courts have held that a co-defendant, like Cannon, cannot invoke the analogous federal rule to challenge the admission of evidence of another defendant's other crimes, wrongs, or acts. *See, e.g.*, *United States v. David*, 940 F.2d 722, 736 (1st Cir. 1991) ("[o]bjections based on Rule 404(b) may be raised only by the person whose 'other crimes, wrongs, or acts' are attempted to be revealed"); *United States v. Gonzalez-Sanchez*, 825 F.2d 572, 583 (1st Cir. 1987) ("Rule 404(b) does not exclude evidence of prior crimes of persons other than the defendant"); *see also*

- 16 -

*United States v. Diaz*, 878 F.2d 608, 616 (2d Cir. 1989) ("[i]n this conspiracy case, evidence of crimes, wrongs or acts by coconspirators is admissible . . . and such proof ordinarily does not raise any Rule 404(b) question") (citations omitted); *United States v. Sepulveda*, 710 F.2d 188, 189 (5th Cir. 1983) (in a drug-conspiracy case, Rule 404(b) did not prevent the introduction of evidence concerning an illegal transaction to which the defendant himself was not a party).[16]

In short, Cannon had no basis to object to the admissibility of evidence of the Ellis and McKelvin murders under Rule 5-404(b). Consequently, he has no basis to insist that the circuit court was required to employ the three-part test for assessing "special relevance" of that evidence. Indeed, at oral argument Winston's attorney conceded that the proper basis for any such objection would have been that the evidence was unfairly prejudicial under Rule 5-403 (*see supra* n. 11), which neither Cannon nor Winston invoked.

Winston's concession is correct. As we described above, the general prohibition on "other crimes" evidence is designed to protect a defendant from being convicted

---

[16] In *Sessoms v. State*, 357 Md. at 281, the Court held that Rule 5-404(b) did not apply to the admissibility of other wrongs that were committed by a witness. Although *Sessoms* does not directly address the specific issue in this case, it strongly implies that the only person who has standing to invoke Rule 5-404(b) is the person whose other wrongs the State seeks to introduce. *See*, *e.g.*, *id.* at 281 ("[b]ecause this rule is premised upon protecting an accused from undue prejudice, it does not apply to exclude acts committed by other people"); *id.* at 285 ("the intent behind this rule to ensure that an accused gets a fair trial free from undue prejudice and bias based on *his or her* past criminal history") (emphasis in original). Notably, in reaching its decision, the Court cited and relied on the various federal cases that hold that one co-defendant may not employ Fed. R. Evid. 404(b) to exclude evidence of other wrongs by a co-defendant. *Id.* at 289-90.

because of an inference that, having engaged in criminal conduct on other occasions, he has a propensity for crime. It is unnecessary to offer the same degree of solicitude to the concern that a defendant may be convicted because a co-defendant has engaged in other criminal conduct. Instead of adopting a general rule that would exclude the evidence of one defendant's other crimes in a trial involving multiple defendants, it makes more sense to admit that evidence, subject to the trial judge's ability to determine, under Rule 5-403, that its probative force is substantially outweighed by the danger of unfair prejudice to a co-defendant.

### III.   JAILHOUSE CALLS

Winston, Mayhew, and Cannon all contend that the circuit court erred in admitting recordings of the jailhouse calls without proper authentication. In support of their contention, however, they did not include any actual argument. *But see* Md. Rule 8-504(a)(6) ("[a] brief shall . . . include . . . [a]rgument in support of the party's position on each issue"). Instead, they "incorporate[d] . . . as if fully set forth the arguments [Mayhew] previously made on this issue in the briefs filed in *Mayhew v. State*, Court of Special Appeals No. 475, September Term, 2014 (filed Aug. 19, 2015)."

In similar circumstances, we have declined to consider such arguments. *See, e.g., Monumental Life Ins. Co. v. U.S. Fidelity & Guar. Co.*, 94 Md. App. 505, 544 (1993) (declining to consider the merits of a party's arguments where the "brief does not *contain* the party's argument, but merely *makes reference* to an argument contained elsewhere") (italics in original); *Rosenberg v. Rosenberg*, 64 Md. App. 487, 515 n.7 (1985) (declining to consider an argument that incorporated by reference a memorandum filed in the circuit

court). But even if some argument were properly before us, we would reject it, because the State did more than enough to satisfy the minimal burden of authenticating the recordings.

Generally, authentication or identification is a condition precedent to the admissibility of certain forms of evidence. *See* Md. Rule 5-901(a). "[U]nder Federal Rule 901, from which Maryland Rule 5-901 is derived, the burden of proof for authentication is slight, and the court 'need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the jury ultimately might do so.'" *Dickens v. State*, 175 Md. App. 231, 239 (2007) (quoting *United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006)).

The requirement of authentication or identification may be "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Md. Rule 5–901(a). "With respect to voice identifications, the Rule provides, '[b]y way of illustration only,' the following examples of authentication: 'Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, based upon the witness having heard the voice at any time under circumstances connecting it with the alleged speaker.'" *Donati v. State*, 215 Md. App. 686, 739 (2014) (quoting Md. Rule 5-901(b)(5)).

In this case, the State called two witnesses who were familiar with Cannon's and Winston's voices to identify their voices on the recordings. The State also called a witness who was familiar with Mayhew's voice to authenticate his voice – after which Mayhew protested that the State did not need to call anyone else on the subject. On these

- 19 -

facts, there can be no serious dispute that the State adequately identified or authenticated the appellants' voices.

Although the appellants advanced no actual argument on the issue of authentication, we surmise, from the factual exposition in Mayhew's brief, that their argument would have concerned the State's failure to call a representative of the private company that stores the recordings of jailhouse calls to authenticate the recordings. That argument seems to suppose that the State had some obligation to obviate any conceivable possibility that someone had fabricated or tampered with the recordings, so as to create the false impression that Cannon, Mayhew, and Winston were planning Nicoh's murder. The short answer to that argument is that, to authenticate a piece of evidence, a party need not rule out every theoretical possibility that the evidence is something other than what he or she says it is; the party need only present a sufficient basis for a jury to find that the evidence is what he or she says it is. The State met that undemanding burden.

## IV.  HEARSAY STATEMENTS

Cannon contends that the court erred in admitting the recordings of the jailhouse calls under Md. Rule 5-803(a)(5), the exception to the hearsay rule for statements by a co-conspirator. He claims that the Stated failed to "establish when the alleged conspiracy was created." Winston adopts Cannon's argument.

Cannon and Winston concede, however, that "trial counsel . . . did not specifically raise this issue in that context." In other words, Cannon and Winston concede that they did not preserve this issue for appellate review. Md. Rule 8-131(a). Nonetheless, Cannon argues that this is "a compelling case for plain error review because there was so

little evidence implicating him in the crime[.]"

"[A]ppellate invocation of the 'plain error doctrine' 1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon." *Morris v. State*, 153 Md. App. 480, 507 (2003); *accord Givens v. State*, 449 Md. 443, 469-70 (2016); *White v. State*, 223 Md. App. 353, 403 n.38 (2015). The Court of Appeals has articulated the following four conditions that must be met before an appellate court will reverse for plain error:

> 1. There must be a legal error that has not been intentionally relinquished or abandoned by the appellant.
>
> 2. The error must be clear or obvious, and not subject to reasonable dispute.
>
> 3. The error must have affected the appellant's substantial rights, which in the ordinary case means that it affected the outcome of the proceedings.
>
> 4. If the previous three parts are satisfied, the appellate court has discretion to remedy the error, but it should exercise that discretion only if the error affects the fairness, integrity or reputation of judicial proceedings.

*Newton v. State*, 455 Md. 341, 364 (2017); *see also Givens v. State*, 449 Md. at 469; *State v. Rich*, 415 Md. 567, 578 (2010).

Meeting all four conditions is, and should be, difficult. *See Givens v. State*, 449 Md. at 469.

Because each one of the four conditions is, in itself, a necessary condition for plain error review, the appellate court may not review the unpreserved error if any one of the four has not been met. For the same reason, the court's analysis need not proceed sequentially through the four conditions; instead, the court may begin with any one of the four and may end its analysis if it concludes that that condition has not been met.

The record reveals no basis for this Court to exercise its discretion to review the record for plain error.  Neither Winston nor Cannon have presented this Court with the recordings, a transcript of the recordings, or even any contentions about any of the particular statements that they believe constituted inadmissible hearsay.  As a result, we are unable to see whether the alleged error affected the outcome or whether it seriously undermined the fairness, integrity, or reputation of the proceedings.  *State v. Rich*, 415 Md. at 578.  Hence, we need not address this unpreserved argument.

In any event, we see no error, let alone any plain error.  From the evidence before us, we can discern that, with Winston's assistance, Mayhew set up a clandestine, back-channel means of communicating with Cannon and Winston.  In those clandestine communications, Cannon, Mayhew, and Winston used slang and coded language to plan Nicoh's murder.  In these circumstances, the clandestine communications themselves are evidence of a conspiracy that began at least as early as the first communication.  It is, therefore, absurd to assert that the State failed to "establish when the alleged conspiracy was created."

## V. MOTION FOR MISTRIAL

At trial, the State was required to prove that the voices on the jailhouse recordings were those of Cannon, Winston, and Mayhew.  To do so, the State called a number of witnesses who were familiar with their voices, played voice exemplars for the witnesses, and had the witnesses confirm that the voices were those of Cannon, Mayhew, and Winston.

One of the voice exemplars appears to have been a recording in which Cannon

said to someone, "Yeah, you know his name, Stanley Winston mon."[17] The court had previously ruled that this recording would not have been admissible for the truth of the matter asserted under the co-conspirator exception to the hearsay rule (Md. Rule 5-803(a)(5)), because Cannon made the statement after the conspiracy had ended. *See, e.g., State v. Rivenbark*, 311 Md. 147 (1987).

When the State played that brief excerpt, each of the defendants objected and moved for a mistrial. The court denied the motion, because it found no willful violation of its earlier order.

On appeal, Mayhew contends that the court abused its discretion in denying the motion for a mistrial, because, he says, the State clearly intended "to have the jury hear inadmissible hearsay." We see no abuse of discretion.

"A mistrial is no ordinary remedy[.]" *Cooley v. State*, 385 Md. 165, 173 (2005). Rather, it is "'an extraordinary act which should only be granted if necessary to serve the ends of justice.'" *Id.* (quoting *Jones v. State*, 310 Md. 569, 587 (1987), *vacated on other grounds*, 486 U.S. 1050 (1988)); *accord Burks v. State*, 96 Md. App. 173, 187 (1993); (stating that mistrial is "an extreme sanction" to which courts sometimes must resort "when such overwhelming prejudice has occurred that no other remedy will suffice to cure the prejudice"); *Rutherford v. State*, 160 Md. App. 311, 323 (2004); *Webster v. State*, 151 Md. App. 527, 566 (2003). Put another way, "[t]he determining factor as to whether a mistrial is necessary is whether 'the prejudice to the defendant was so

---

[17] We say "appears" because the appellants failed to have a court reporter transcribe any of the audio recordings that were played during the trial.

substantial that he [or she] was deprived of a fair trial.'" *Kosh v. State*, 382 Md. 218, 226 (2004) (quoting *Kosmas v. State*, 316 Md. 587, 595 (1989)).

"'[A] request for a mistrial in a criminal case is addressed to the sound discretion of the trial court[.]'" *Cooley v. State*, 385 Md. at 173 (quoting *Wilhelm v. State*, 272 Md. 404, 429 (1974), *abrogated on other grounds recognized by Simpson v. State*, 442 Md. 446 (2015)). "[T]he trial court is peculiarly in a superior position to judge the effect of any of the alleged improper remarks." *Wilhelm v. State*, 272 Md. at 429.

> The judge is physically on the scene, able to observe matters not usually reflected in a cold record. The judge is able . . . to note the reaction of the jurors and counsel to inadmissible matters. That is to say, the judge has his finger on the pulse of the trial.

*Simmons v. State*, 436 Md. 202, 212 (2013) (quoting *State v. Hawkins*, 326 Md. 270, 278 (1992)).

An appellate court will not reverse a denial of a mistrial motion absent clear abuse of discretion (*see Simmons v. State*, 436 Md. at 212; *Browne v. State*, 215 Md. App. 51, 57 (2013)), and certainly will not reverse simply because it might have ruled differently. *See Nash v. State*, 439 Md. 53, 67 (2014) (citations omitted). A trial court abuses its discretion when its ruling is "'clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result,' when the ruling is 'violative of fact and logic,' or when it constitutes an 'untenable judicial act that defies reason and works an injustice.'" *King v. State*, 407 Md. 682, 697 (2009) (quoting *North v. North*, 102 Md. App. 1, 13-14 (1994)). To amount to an abuse of discretion, "[t]he decision under consideration has to be well removed from any center mark imagined by the reviewing

court and beyond the fringe of what that court deems minimally acceptable." *Id.* (quoting *North v. North*, 102 Md. App. at 14).

In this case, the mistrial motion was based on a fallacious premise. In playing the recording of Cannon saying, "Yeah, you know his name, Stanley Winston mon," the State was not attempting to evade the court's earlier ruling and to admit Cannon's statement to prove the truth of the matter asserted – i.e., the State was not attempting to prove that the unidentified person to whom Cannon was speaking knew Stanley Winston (or knew Winston's name). Rather, the State played the recorded statement for the non-hearsay purpose of having its witness affirm that the voice on the recording was that of Cannon.

To the extent that Cannon's enunciation of Winston's name proved that Cannon knew or knew of Winston, it was not hearsay, but rather circumstantial evidence of their familiarity with one another. That evidence was cumulative of a great deal of other admissible evidence that showed that Cannon, Winston, and Mayhew knew each other and were in regular communication with one another. As the State argues, "evidence that the three of them knew one another was relevant to show the existence of a conspiracy – conspiracies between acquaintances being more common than conspiracies between utter strangers."

In summary, the circuit court could not possibly have abused its discretion in denying a motion for a mistrial after the playing of the recording, because there is no

basis to contend that the recording was inadmissible.[18]

## VI.   STATE'S CLOSING ARGUMENT

In rebuttal closing, the State made the following argument:

You heard about this jail visit, about the one in November that scared
Nicoh, that changed his behavior.  He began to camouflage himself after
that.  The defendant even referenced it.  You're dealing with a dude who be
camouflaging for real.  Hard to find.  Why?  He was scared, for good
reason.  He was holding his son close, which I always found interesting.
Not keeping his son at a distance because he was threatened, holding his
son close.  Now, we're this close which is probably about the distance of
that small little [visiting] booth.  Do I need to scream or shout to be
threatening?  Do I need to scream or shout to very simply say, if you testify
your son dies?

Mayhew's defense counsel objected.  The court overruled the objection.

Mayhew now contends that the State's argument "went beyond the pale of

permissible advocacy," because, he says, "[t]here is absolutely no evidence to support the

State's closing argument that [Mayhew] threatened to kill [M.]."  We disagree.

"A trial court is in the best position to evaluate the propriety of a closing

argument[.]"  *Ingram v. State*, 427 Md. 717, 726 (2012) (citing *Mitchell v. State*, 408 Md.

368, 380-81 (2009)).  Therefore, we shall not disturb the ruling at trial "unless there has

been an abuse of discretion likely to have injured the complaining party."  *Grandison v.*

---

[18] In addition to erroneously contending that the recording contained inadmissible
hearsay, some of the defendants argued that the State was overproving its case by calling
multiple witnesses to identify Cannon's voice.  Of course, if the State had not called as
many witnesses as it had, the defendants might have argued that it had not done enough
to discharge its burden of proving that it was really Cannon's voice on the recordings.  In
any event, the question of whether any testimony was cumulative is one that is reposed in
the circuit court's discretion.  The appellants do not, and cannot credibly, argue that the
circuit court abused its discretion in permitting the State to call multiple witnesses to
identify Cannon's voice.

*State*, 341 Md. 175, 243 (1995) (citing *Henry v. State*, 342 Md. 204, 231 (1991).  Trial courts have broad discretion in determining the propriety of closing arguments.  *See Shelton v. State*, 207 Md. App. 363, 386 (2012).

"[A]ttorneys are afforded great leeway in presenting closing arguments[.]" *Degren v. State*, 352 Md. 400, 429 (1999).  "'The prosecutor is allowed liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom.'"  *Id.* at 429-30.  "Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom; the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is [the] accused's counsel to comment on the nature of the evidence and the character of witnesses which the (prosecution) produces."  *Wilhelm v. State*, 272 Md. at 412; *accord Degren v. State*, 352 Md. at 430.

> While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments [of] opposing counsel, generally speaking, liberal freedom of speech should be allowed.  There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-defined bounds beyond which the eloquence of an advocate shall not soar.  He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses.  He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.

*Wilhelm v. State*, 272 Md. at 413; *accord Degren v. State*, 352 Md. at 430.

Even when a prosecutor's remark is improper, it will typically merit reversal only "'where it appears that the remarks of the prosecutor actually misled the jury or were

likely to have misled or influenced the jury to the prejudice of the accused.'" *Lawson v. State*, 389 Md. 570, 592 (2005) (quoting *Spain v. State*, 386 Md. 145, 158-59 (2005)).

Here, the prosecutor's comments never strayed from the evidence presented to the jury. Ms. Dinkins-Mayhew testified that, following Nicoh's encounter with Mayhew at the detention center, Nicoh looked "scared," that "[h]e kept the baby close," and that he "didn't want to leave the baby." Nicoh's girlfriend similarly described Nicoh as "scared, more paranoid . . . [and] [w]orried that somebody was, like, going to do something to him."

Counsel is free to "state and discuss . . . all reasonable and legitimate inferences which may be drawn from the facts in evidence." *Wilhelm v. State*, 272 Md. at 412. This includes an inference that Nicoh may have wanted to keep his son near him because Mayhew threatened to harm the child. Because the trial court was in the best position to judge the propriety of these comments (*see Ingram v. State*, 427 Md. at 726 (citing *Mitchell v. State*, 408 Md. at 380-81)), we defer to its decision.

## VII. SUFFICIENCY OF EVIDENCE

As a final contention, Mayhew and Cannon challenge the sufficiency of the evidence supporting their convictions. Mayhew focuses exclusively on the State's failure to provide transcripts of the jailhouse calls during trial. Cannon joins in Mayhew's argument, but also contends that the evidence for his conviction was insufficient because there was no forensic evidence, no eyewitness identification, and no "directly incriminating statements." Cannon and Mayhew have waived these arguments, because they failed to raise them when they moved for a judgment of acquittal at trial. *See Berry*

*v. State*, 155 Md. App. 144, 180 (2004).

Md. Rule 4-324(a) requires the defendant "to state with particularity all the reasons why the motion [for judgment of acquittal] should be granted[.]"  The issue of sufficiency of the evidence is not preserved when the defendant's motion for judgment of acquittal is on a ground different from the one set forth on appeal.  *Mulley v. State*, 228 Md. App. 364, 388 (2016); *accord Hobby v. State*, 436 Md. 526, 540 (2014).  Consequently, a defendant may not tell the trial court that the evidence was insufficient for one reason, but then urge a different reason for the insufficiency on appeal in challenging the denial of a motion for judgment of acquittal.  *Id.* at 388-89; *accord Hobby v. State*, 436 Md. at 540.

When Mayhew's counsel moved for judgment of acquittal at the close of the State's case, his only specific comments concerned the charging document and the putative absence of evidence that Mayhew intended to injure Nicoh's two-year-old son. Similarly, when Cannon's counsel moved for judgment of acquittal, he confined his comments to the credibility of the testimony, particularly the testimony of the witnesses who identified Cannon's voice on the jailhouse recordings.  Because Cannon and Mayhew raise "different reason[s]" in challenging the denial of motions for judgment of acquittal on appeal from the ones that they raised at trial, their arguments are not preserved for our review.  *See Mulley*, 228 Md. App. at 388; Md. Rule 8-131(a).

But even if Cannon and Mayhew had preserved the arguments that they now wish to advance, we would conclude that the evidence was sufficient to sustain their convictions.

- 29 -

Evidence is sufficient if, viewing it "in the light most favorable to the State, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Riggins v. State*, 223 Md. App. 40, 60 (2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).  In applying that standard, we defer to the jury's evaluations of witness credibility, its resolution of evidentiary conflicts, and its discretionary weighing of the evidence, by crediting any inferences the jury reasonably could have drawn.  *See State v. Manion*, 442 Md. 419, 431 (2015).

Mayhew challenges the State's description of the jailhouse calls, pointing out that the recordings were never transcribed into the record.  He says: "Without knowing what was said in the jailhouse calls, there is insufficient evidence to sustain any of [his] convictions."  It appears, however, that the recordings were never transcribed into the record because none of the attorneys (including Mayhew's attorney) ever asked the court reporter to transcribe them.  Rule 8-411(a)(1) requires an *appellant* to provide a transcription of all the testimony that is necessary for the appeal.  In view of that requirement, Mayhew cannot ignore his obligation to secure a transcript and then use his own failure as a reason for us to rule in his favor.  *See Whack v. State*, 94 Md. App. 107, 126-27 (1992).

Nonetheless, if we relied on the State's interpretation of the jailhouse calls, which is in the record, the evidence was more than sufficient to support Mayhew's convictions.  In the calls, Mayhew can be heard describing the scene where the murder would occur, informing his co-conspirators when Nicoh would arrive and what car he would be driving, telling them that it was "show time tomorrow" on the day before the murder

occurred, and relating other details that the assassins seemed to have noted (such as Ms. Dinkins-Mayhew's dented, gold Hyundai). Furthermore, Mayhew not only had a motive to murder Nicoh, but Nicoh acted as though Mayhew had threatened him (and his child) after their brief encounter at the jail in late November 2012. *Washington v. State*, 293 Md. 465, 468 n.1 (1982) ("[e]vidence of threats to a witness, or attempts to induce a witness not to testify . . . is generally admissible as substantive evidence of guilt when the threats or attempts can be linked to the defendant"); *see also Copeland v. State*, 196 Md. App. 309, 315 (2010) ("[t]hreats are admissible because they demonstrate consciousness of guilt"); *Saunders v. State*, 28 Md. App. 455, 459 (1975) ("an attempt by an accused to suborn a witness is relevant and may be introduced as an admission by conduct, tending to show his guilt"). On the basis of this evidence, it would hardly have been unreasonable for a jury to convict Mayhew of the offenses with which he was charged.

To the extent that Cannon's sufficiency argument says anything different from Mayhew's, it is simply an invitation to reweigh the evidence, which we cannot do. It does not matter that the State adduced no "forensic" evidence of Cannon's participation in the murder, no eyewitness identification of him as one of the assailants, and no "directly incriminating statements" as long as some rational jury could conclude that the other evidence was sufficient to establish his guilt.

Here that standard was met. Through the testimony of witnesses who were familiar with Cannon's voice, the State proved that he participated in the jailhouse calls in which Mayhew planned and orchestrated Nicoh's murder; through cell phone records, the State established that Cannon was near Ms. Dinkins-Mayhew's apartment in Seat

Pleasant within 10 minutes of the murders even though he had not been in that vicinity for two months; his physical appearance was at least broadly consistent with the eyewitness's general description of the assailants; and he and Winston, whose cell phone records also placed him near Ms. Dinkins-Mayhew's apartment less than 20 minutes after the murder, exchanged texts in which they included a picture of a news article about the murder.

Although a rational jury would not have been required to convict Cannon on the basis of this evidence, it was certainly permitted to do so. Hence, Cannon's sufficiency challenge fails.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

# APPENDIX

In his brief, Winston set forth the following issues:

1. The first issue is whether the Circuit Court violated Mr. Winston's due-process and statutory rights when it denied his motion for a severance.

2. The second issue is whether the Circuit Court erred when it admitted details of another murder committed by a co-Defendant without properly conducting the three-prong test required for admission under Rule 5-404(b).

3. The third issue is whether the Circuit Court erred when it admitted hearsay statements under Maryland Rule 5-803(a)(5) because the State did not establish when the alleged conspiracy was created.

4. The fourth issue is whether the Circuit Court erred when admitting recordings of jailhouse phone calls without proper authentication.

In his brief, Mayhew set forth the following questions:

1. Did the Circuit Court err in denying appellant's motion for mistrial?

2. Did the Circuit Court err in allowing the prosecution to argue in closing that appellant threatened a two-year old child, without any supporting evidence?

3. Did the Circuit Court err in admitting recordings of jailhouse phone calls, without proper authentication?

4. Was the evidence sufficient to sustain the convictions?

In his brief, Cannon set forth the following questions:

1. Did the Circuit Court err and violate Cannon's right to a fair trial when it admitted details of another murder allegedly committed by a co-Defendant without properly conducting the three-prong test required for admission under Rule 5-404(b) to determine whether the need for such details outweighed the degree of prejudice to Defendant Cannon?

2. Did the Circuit Court err and violate Cannon's right to a fair trial when it denied Cannon's motion to sever his trial from co-Defendant Brian Mayhew?

3. Did the Circuit Court err when it admitted hearsay statements against Cannon under the authority of Rule 5-803(a)(5) because the State did not establish when the alleged conspiracy was created, thereby precluding a finding that the hearsay statements were made "by a coconspirator of the party during the course and in furtherance of the conspiracy?"

4. Did the Circuit Court err and violate Cannon's right of confrontation in admitting recordings of jailhouse phone calls without proper authentication?

5. Was the evidence presented at trial legally insufficient to sustain Appellant's convictions?

Circuit Court for Prince George's County
Cases CT-13-0606A, CT-13-0606B, CT-13-0606C

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

CONSOLIDATED CASES

No. 2838; September Term, 2015

_____

STANLEY RAY WINSTON
v.
STATE OF MARYLAND

_____

No. 70; September Term, 2016

_____

BRIAN CUFFIE MAYHEW

v.

STATE OF MARYLAND

_____

No. 74; September Term, 2016

_____

ANTHONY CANNON

v.

STATE OF MARYLAND

_____

Meredith,
Graeff,
Arthur,

JJ.

_____

Concurring Opinion by Meredith, J.

_____

Filed:   February 2, 2018

Although I agree fully with the majority opinion's excellent analysis in Parts I, II, III, V, VI, and VII of the opinion, and I also concur in the result reached in Part IV of the opinion, I write separately to express my concern regarding the majority opinion's discussion of the plain error doctrine in Part IV. Even though the majority opinion's explanation of the plain error doctrine is consistent with two recent decisions of the Court of Appeals, it is not fully consistent with other recent decisions of the Court of Appeals that, in my opinion, represent the better view.

In Part IV, the majority opinion cites *Givens v. State*, 449 Md. 443 (2016), and *Newton v. State*, 455 Md. 341 (2017), in its discussion of the plain error doctrine. In those cases, the Court of Appeals departed from prior holdings that had described the decision as to whether to grant plain error review of an issue that had not been properly preserved at trial as being fully committed to the discretion of the appellate court. The more traditional description of the plain error doctrine was set forth by Judge (now Chief Judge) Mary Ellen Barbara, writing for a unanimous Court of Appeals in *Yates v. State*, 429 Md. 112, 130-31 (2012), as follows:

> In general, a party must object to the failure to give a particular instruction promptly after the instructions are delivered, stating the grounds for the objection. Maryland Rule 4–325(e). This rule of contemporaneous objection applies even to errors of constitutional dimension. *Savoy v. State*, 420 Md. 232, 241–42, 22 A.3d 845 (2011). "An appellate court, on its own initiative or on the suggestion of a party, may, however, take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object." Maryland Rule 4–325(e).
>
> Plain error review is reserved for errors that are "compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial." *Savoy*, 420 Md. at 243, 22 A.3d 845 (2011) (quoting *State v. Hutchinson*, 287 Md. 198, 203, 411

A.2d 1035 (1980)). Among the factors the Court considers are "the materiality of the error in the context in which it arose, giving due regard to whether the error was purely technical, the product of conscious design or trial tactics or the result of bald inattention." *Id.* This exercise of discretion to engage in plain error review is "rare." *Id.* at 255, 22 A.3d 845.

"There is no fixed formula for the determination of when discretion should be exercised, and there are no bright line rules to conclude that discretion has been abused." *Garrett v. State*, 394 Md. 217, 224, 905 A.2d 334 (2006) (alteration in original) (quoting *Jones v. State*, 379 Md. 704, 713, 843 A.2d 778 (2004)). The standard set out in *Garrett* encapsulates the principles guiding our review of the intermediate appellate court's decision:

> [W]e do not reverse the Court of Special Appeals for the exercise of its discretion unless it has clearly been abused. While this Court retains its own independent discretion to hear unpreserved arguments, that does not mean we review the discretionary functions of the lower appellate court *de novo*. To the contrary, we respect the judgment of the Court of Special Appeals in determining whether it needed to consider the issue for the proper execution of justice, and unless upon our review that court abused its discretion under the Rule, we will not substitute our judgment for theirs.

*Id.* (internal citation omitted) (quoting *Jones*, 379 Md. at 715, 843 A.2d 778).

The *Yates* Court's quotation in 2012 of the *Garrett* Court's 2006 statement that "[t]here is no fixed formula for the determination of when discretion should be exercised, and there are no bright line rules to conclude that discretion has been abused," leads me to conclude that the Court of Appeals had not intended to impose bright line restrictions on its (or our) discretion to grant plain error relief when the Court quoted in *State v. Rich*, 415 Md. 567, 578 (2010), a passage from *Puckett v. United States*, 556 U.S. 129, 135 (2009) (describing plain error review under Federal Rule of Criminal Procedure 52(b)). Consequently, I am unwilling to concede that the Court of Appeals has overruled the *Yates* Court's explanation of Maryland's plain error doctrine.

In most cases, this discrepancy will not make a difference in the result. But it is certainly possible that, on rare occasions, there may be claims of unpreserved error that merit exercise of the appellate court's discretion to grant relief even though the case does not satisfy the conditions described in the majority opinion. In my opinion, the version of the plain error doctrine set forth in *Yates* better provides the opportunity for appellate courts to address such rare anomalies.